NICHOLLS, J.
The plaintiffs and appellants in this case suggested to the court that page 19 of the transcript filed in the above cause in this court was not properly a part of the record, because said document was never offered in evidence and is not identified by the mark “Exhibit A,” as stated in the answer of the defendants found on page 12 of transcript; that the filing mark of the clerk of court on said document, found at the foot thereof on page 19, is an error, there being no filing mark on said document as it appears in the original record, but said filing mark is on the folder or wrapper of the entire answer; that the said document on page 19 is separate and distinct from the other portions of said answer — i. e., on a separate sheet and attached only by eyelets or ciamps; that the remainder of said answer, which consists of 11 other sheets and the wrapper or folder, shows perforation marks which do not appear in said sheet on which' document on page 19 is written, said perfora *643 tion marks showing that the first eyelets or clamps that were used in fastening said sheets of said answer together were' removed and others inserted in other places, but this does not appear in the sheet on which page 19 is written wholly in type; that said document was not read in the lower court, nor was it considered by the court.
They further urge and allege that they have demanded of the clerk of the trial court that said page 19 be expunged from the record, or that they be shown the original of the document; that the clerk says that he remembered nothing of said document, and failed to find any record thereof, and he further informs appearers that he has demanded of the attorneys for defendants the original, and they have informed him that they cannot find it. They further alleged that they knew nothing of any such document until the transcript was finished, only a few days since, and upon seeing page 19 they, through their attorneys, examined the original record and found the same as above stated and in the condition as above set forth.
Movers allege that they attach affidavits hereto and make same part of this record: Wherefore appellants, in view of the premises, prayed that the appellees do show cause before the court at the city of New Orleans on Monday, the 4th day of November, 1907, at 11 o’clock a. m., why the transcript should not be ordered back to the trial court for the purpose of having proper proceedings instituted to correct the transcript, or, in the alternative, that said page 19 of the transcript be held for naught and not considered in the determination of the issues herein Joined. They further prayed for all orders and decrees necessary in the premises and for full and general relief.
Defendants, though notified of this application, have urged no objection to the granting of the application.
Under the sworn statements made in the application as to the incorrectness of the transcript, it is proper that the application be granted.
It is therefore ordered by the court that the transcript filed herein be sent back to the trial court for the purpose of having proper proceedings instituted to correct, contradictorily with the defendants, the transcript, if incorrect. The district court will fix a day and place for taking (after notification of the parties) the testimony of such witnesses as the parties may produce touching said transcript, and on said day will take and have reduced to writing such testimony, and, having done so, return said transcript, with the testimony, to this court.
Statement of the Case.
MONROE, J.
Harry D. Smith, Jr., and John M. Caffery, bring this suit to have themselves recognized as the owners of 29,997 (out of a total of 30,000) shares of the stock of the Shippers’ Oil Company, said to have been acquired from the Gulf National Bank, of Beaumont, Tex., and for the appointment of a receiver to, and the dissolution of, said company. They also pray that O. D. Hill, president, and R. W. Banks, secretary, of tbe company, be enjoined from disposing of its property or changing the status of its affairs to their (plaintiffs’) prejudice on the grounds that they are Jeopardizing the rights of the stockholders by grossly mismanaging the affairs of company, committing acts that are ultra vires, and misusing the corporate property and funds; and a preliminary injunction was issued as prayed for.
Defendants deny generally, and for the most part specially, the allegations of the petition, save as admitted. They specially deny that plaintiffs have ever acquired, as owners, the stock in question, and allege that they acquired possession of it as pledgees in a. manner and under circumstances which they proceed to set forth. They further allege *645 that there exists no cause for the appointment of a receiver, and they pray that plaintiffs be required, within a delay to be fixed, to accept or reject the tender of $19,850 made to them, that they be decreed to be the pledgees of the stools: sued on and ordered to surrender the same, together with the note and obligation by which it is secured, on payment of said amount, or (in the event of their rejection of said tender) on payment of such amount as may be found to be due them.'
Charles D. Hill intervenes in the suit, and, setting up the matters contained in the answer, alleges that he is the owner of the stock in controversy, and he prays that plaintiffs be enjoined from disposing of it, and that his ownership be recognized, on payment to plaintiffs of the amount due them, and a preliminary injunction was issued accordingly.
It appears from the evidence in the record that the defendant Hill, and A. K. Riley, who owned the stock here in question, gave to the Gulf National Bank, of Beaumont, Tex., the note of the Shippers’ Oil Company for $20,-000, in payment of two notes, of $10,000 each, of the Abbott Oil Company, one of which had been discounted for the Shippers’ Oil Company, and the other for the Abbott Company, or J. M. Abbott. Some time after-wards Hill paid $2,000 on account of the note so given, and gave a new note of the Shippers’ Company (for $18,000), indorsed by himself and J. M. Abbott (who had by that time acquired Riley’s stock), and secured by pledge of the same stock, as also of the interest of the Shippers’ Company in a contract with plaintiffs whereby the latter were to deliver 27,500 barrels of oil, valued at $1 a barrel, and of an interest or “equity in well No. 8, Shippers’ Oil Company, Jennings”; the two items last mentioned being pledged subject to pre-existing claims on them amounting to about $11,000. At a later date, say in May, 1907, Hill acquired the interest of Abbott in the pledged stock (and thus became the owner of the whole of it), under an agreement between him and Abbott whereby he was to become the sole owner of the Shippers’ Company, and Abbott was to become the sole owner of the Traders’ Company (in which they were also interested), and as part of which the Traders’ Company on May 3, 1907, gave to the bank its demand note for $10,000 (with collateral), which was accepted as a payment on account, to the extent of $8,500, of the note of the Shippers’ Company for $18,000, thus leaving due upon that note a balance of say $9,500.
The Shippers’ Company, it may here be stated, owned (in addition to wells 1 and 2, which they had transferred to plaintiffs by the contract calling for the delivery to them of 27,500 barrels of oil, as hereinabove stated) a well, known as “No. 3,” located on a 40-acre tract which was then the subject of a lawsuit between the Jennings-Heywood Oil Syndicate and the Houssiere-Latreille Oil Company, and had been proved to be producing and valuable property, and, as it occupied the position of sublessee under the last-named company, it was much interested in the result of that suit, which was then awaiting decision in this court. On June 3,1907, therefore, Hill wrote to Williams, president of the bank, informing him that the case had been argued and that the representatives of the Houssiere-Latreille Company felt confident as to the result, and saying:
“It seems as though we will be in shape to clean up everything within' 30 days from this date. * * * Will keep you posted as to developments.”
To this Williams replied, on the following day:
“I thank you very much for your kind letter of the 3d advising me of the situation at Jennings in regard to prospects of an early settlement of the lawsuit. Tou say nothing in your letter about the present income from the wells, and nothing about their operation. Are they all at work, and what have been the net results since the other people took charge? I’d be glad to have you write me fully. I fully ap- *647 precíate the fact that you are looking after this matter for us, and I hope that the final results are going to be that we will be paid in full and that you will get something out of it yourself.”
At the time that Hill’s letter was received, at the bank, Abbott, who seems to have been on very friendly terms with its officers and unfriendly to Hill, was present, and the letter was shown to him, and whether by reason of his representations or otherwise, and notwithstanding the terms of the letter written by Williams, he (Abbott) was sent to Jennings upon a mission which is perhaps best described in the language used by Williams in answer to certain cross-questions propounded to him as a witness,, to wit:
“I simply showed him the letter [referring to Hill’s letter of June 3d], and then sent him over to Jennings to look over the situation pertaining to the property, with the understanding that at all times he had full authority to dispose of the collateral that we held at any time that he saw an opportunity of making a sale that would pay us the amount of our indebtedness. * * * Mr. Abbott did not go to Jennings with the direct instructions to make demanpl for the payment of the indebtedness on the Shippers’ Oil Company or Mr. Hill; but it was clearly understood at all times that, whenever an opportunity offered to make a satisfactory sale, he had full authority to do so.”
Abbott was not called as a witness, and the manner in which he understood and executed his commission appears from the un-contradicted testimony of R. W. Banks, the father-in-law of Hill, who says that Abbott appeared at his house in Jennings at breakfast on the morning of June 6th, and took his dinner and supper there on that day, and his breakfast and dinner on June 7th; that on the evening of the 7th he had boarded the train, but stepped off and met Caffery, plaintiff herein; that later in the evening he returned to witness’ house to supper, and later still, as witness was accompanying him part of the way “down town,” under a pledge of secrecy (from which he subsequently released the witness, in so far as the latter’s wife and Hill were concerned), made a statement which the witness gives as follows:
“He then went on to tell me that he had seen Mr. Caffery and Mr. Smith at the train, and had concluded not to leave. He said that they were going down with me to Beaumont tonight, and to-morrow there will be a demand made on Mr. Hill to pay those notes of the Shippers’ Oil Company by the Gulf National Bank, and if not paid by 9 o’clock Monday morning he is going to be sold out; and I said: ‘That is pretty hard. That will ruin him; for he has felt that he owned the Shippers’ Oil Company, and he has put everything he had in the Shippers’ Oil Company — his interest in the Humboldt [Humble] property.’ He said: ‘Yes; but he is going to be sold out. Caffery and Smith are going to buy him out, and, if they don’t buy him out, I am going to buy him out myself.’ ”
The witness then testified, that he told Hill what he had heard about 10 o’clock that night.
On the following morning, about 8 o’clock, Hill telephoned to Williams (at Beaumont) ; his uncontradieted testimony upon the subject being as follows:
“I telephoned Mr. Williams, probably about 8 o’clock, and told him that I had learned, very late that night, that Mr. Abbott and Mr. Caf-fery and Mr. Smith were on their way over to make some kind of a trade, and he told me that was the first he had heard of it, and that nothing would be done until I was notified.”
About 9 o’clock Hill telephoned to Caffery (who by that time had reached the bank) and remonstrated with him (without effect, however), and about 11 o’clock Caffery telephoned to him that he had about concluded to make the trade (the intervening time having been spent by him and Smith in examining the papers and discussing the matter with the bank officials), to which Hill replied:
“I don’t understand that, because Mr. Williams assured me, this morning, that nothing would be done until he gave me a chance — until he communicated with me.”
And the witness proceeds:
“He [Caffery] said: ‘Mr. Williams is here now. I will call him to the phone.’ I said I would be glad to speak to him. Mr. Williams came to the phone. I said: ‘Mr. Williams, I *649 understand you are about to make some kind of a deal with Mr. Caffery there for the Shippers’ Oil Company. You promised me, this morning, that you would not do anything.’ He says: ‘Wait a minute, and I will have Judge Greer speak to you.’ I waited at the telephone for a few minutes, and he came back, and he said for me to ring up 191 Beaumont. ‘That is Judge Greer’s office. You will find him there. He has left the bank.’ I immediately asked ‘Central’ to give me Judge Greer’s phone, 191 Beaumont, and kept after it until probably 12 o’clock, when she reported that Mr. Greer had left his office and could not be found.”
In the meanwhile plaintiffs, after a thorough examination of the papers, which had been submitted to them for that purpose by the officers of the bank, had concluded their negotiations. Greer, the vice president and attorney of the bank, had gone through the form of making a demand upon the cashier and paying teller for the payment of the balance due upon the note of the Shippers’ Company, and also for the payment of the note of the Traders’ Company, and, having been told that there were no funds, had advised the president to transfer the papers to plaintiffs “without recourse,” and it had been agreed that the transfer should be made when plaintiffs should have obtained the in-dorsement upon their note for $19,656, payable in four months, with interest at 4 per cent, (which was the consideration of the proposed sale), of Don Caffery, Jr., the brother of John M. Caffery, plaintiff, which having been obtained, the transfer appears to have been completed as of date June 8, 1907, by the bank’s indorsement without recourse of the note of the Shippers’ Company for $18,000, with interest, subject to a credit of $8,500, and of the Traders’ Company for $10,-000, together with the contract of the Shippers’ Company with plaintiffs, which had been assigned to the bank as collateral and which called for the delivery of oil, the greater part of which was in the hands of plaintiff in his capacity of judicial sequestrator' in the matter of Jennings-Heywood Syndicate v. Houssiere-Latreille Oil Co., and by the delivery of the papers so indorsed and of the certificates of the stock here in question to plaintiffs. The participants in the transaction are not, however, exactly agreed as to the details, as will be seen from the following excerpts from the testimony given by them, respectively: Caffery, after stating that Abbott had proposed to him to buy the entire physical properties of the Shippers’ Oil Company for the price of $19,500, says:
“I investigated the proposition, and went to Franklin to obtain legal advice upon it. I concluded to accept the proposition, and went to Beaumont next morning with Mr. Abbott to meet the directors of the bank and to purchase the property. The president of the bank, Mr. Williams, the attorney of the bank, Mr. Greer, and the vice president, Mr. Dunlap, were there, and met Mr. Smith and myself in the directors’ room, * * * and we discussed this proposition. I examined all the papers of the Shippers’ Oil Company, and finally told Mr. Williams that I would close. Mr. Greer went to the cashier’s stand and I heard him demand of one of the cashiers this money on this note, and the cashier told him * * * that he could not make the payment. We came back into the directors’ room, and I told him that the bargain was closed. * * * Later on Mr. Williams informed me that there was some interest due on the note, and said that he would like to add that to it. As it was only a few hundred dollars, I consented. As that was the first transaction of that kind I had ever entered into, I did not understand the legal status of the affair, and I asked advice of the attorney of the bank, Mr. Greer, concerning the notes, and the difference between the notes and the physical properties. I told him that * * * I was offered, and had bought, the entire physical properties of the Shippers’ Oil Company, and wanted to know' if the notes would sustain me in their possession. He informed me that I was the owner of the Shippers’ Oil Company, with its stock and all its other physical properties, and was entitled to do with them as I pleased — that I was the Shippers’ Oil Company.”
On bis cross-examination he states the proposition made to him by Abbott, and further testifies as follows:
“Mr. Abbott said to me, in substance: * * * The bank at Beaumont holds a note, or notes, of the Shippers’ Oil Company for about $19,-500. It has been considered dead paper for a long time. I am over here to see if the bank can’t realize on it. He showed me what he thought were the assets of the company, * * * and I think we figured that, in case of a favorable decision by the Supreme • Court and that *651 everything went lucky with the wells of the company, its assets were about $40,000, or $45,-000, against * * * the note of the bank for $19,500, a debt of Father Rouge, * * • which was about $10,000, and a note at the State National Bank at Jennings for $2,500, in all amounting to about $32,000. He asked me if I thought it looked attractive enough to buy. I told him that I would like to think it over and go to Franklin and get'some legal advice. * * * Q. Did you go to Franklin? A. Yes, sir. Q. Who did you consult with about it? A. My brother. Q. You submitted the matter to him? A. Yes, sir. * * * Q. In the Hous-siere-Latreille litigation against the Syndicate, did you occupy any official position, as an officer of the court? A. I did. Q. What was that position? A. Judicial sequestrator. * * * Q. On June 6th did you have in your hands, or under your control, belonging to the Shippers’ Oil Company, any money, bonds, or oil? (Objection and ruling.) A. There was no cash on hand. There were bonds. * * * Q. I will ask you to examine that statement [being a statement prepared by the witness as judicial sequestrator] and state what was shown to be the property in your hands of the Shippers’ Oil Company, about June 7, 1907? A. About $13,000 or $14,000 in bonds, and about 6,000 or 7,000 barrels of oil [the bonds referred to having been received for the release of oil, and the oil having been worth $1 per barrel]. * * * Q. Mr. Caffrey, did you examine those notes [referring to the notes of the Shippers’ and Traders’ Oil Companies] carefully in the bank that morning? A. Yes, sir. Q. You scrutinized them particularly, and knew their contents fully? A. This being the first transaction of thjs kind that I ever entered into, I did not understand these notes absolutely and fully. Q. You did not understand them fully? You examined them, however? A. Yes, sir. * * * Q. You and Mr. Smith, did you have any other papers there? A. Yes, sir. Q. What other papers did you have? A. I had the stock. I had the paper showing the amount of expenses of the Shippers’ well No. 3 which was pledged to the bank. * * * Q. Did you see any contract there between Caffery and Smith [and the Shippers’ Company] on wells Nos. 1 and 2? A. Yes, sir; I think that paper was there. * * * Q. Now, Mr. Caffrey, what was your proposition to the bank? A. That I would buy all the physical properties of the Shippers’ Oil Company for the amount of those notes— $19,500. By the Court: Q. What did you mean by the physical properties of the Shippers’ Oil Company that you would buy- from that bank? A. All their interest in the well known as ‘Shippers’ No. 3,’ and their interest in the wells known as ‘Shippers’ Nos. 1 and 2,’ on the Jennings field, together with the leases of the land on which the wells were drilled— Shippers’ 1 and' 2. By Mr. Wheless (counsel for defendant): Q. Now, including the physical properties, etc., did your proposition cover that note as well, marked ‘D 1’ [referring to the note of the Shippers’ Company]? A. Including the physical properties of the Shippers’ Oil Company; yes, sir. I thought it included this note and everything. Q. Did it also include note marked ‘D 2’ [referring to the note of the Traders’ Company for $10,000]? A. Yes, sir. Q. Did it include this contract of Caffery & Smith, D 3? A. Yes, sir. Q. Did it include this contract, marked ‘D 4’? A. This contract was also — yes, this is a contract — it did include that contract. Q. What was the price agreed upon that you were to pay for documents 1, 2, 3, and 4, as exhibited to you? A. $19,500, plus some interest on the note — amounting to several hundred dollars. * * * Q. Did you receive the papers immediately? A. No, sir. Q. What was done with them? A. They were retained at the bank; although the agent of the bank had made me a proposition to buy them, and said my note, together with Mr. Smith’s, would be perfectly good at the bank, when we arrived there the next morning Mr. Williams said that he didn’t know me or Mr. Smith, and that he would like to get other indorsers on the note, and I asked my brother if he would indorse for me. * * * Q. Well, the bank kept the papers, at any rate, didn’t they? A. Yes, sir. Q. They didn’t deliver them to you and Mr. Smith. Didn’t they send them to Franklin? A. They sent them to Franklin. Q. All of them? A. Yes, sir. Q. Do you know what was done with them, after that? A. They were sent back to the bank — they were taken by — I think I took them from the bank. * * * Q. On instrument marked ‘D 4’ I find the in-dorsement: ‘Transferred to John M. Caffery and H. D. Smith, without recourse. A. L. Williams, President.’ Do you know when that indorsement was put on? A. I am under the impression that it was transferred the morning of the sale. I don’t remember especially to have seen this written. Q. It appears on these notes, D 1 and D 2, that a similar indorsement is made of ‘6/8/07’ on both notes. Now, was this indorsement put on there at the same time, or haven’t you had that indorsement put on there since? A. I am positive that the indorsement on one of the notes was put on there at the time, because I asked Mr. Williams what that meant. * * * Q. So far as you know, all the indorsements were made at the same time? A. At the same time.”
Mr. Greer, the vice president and attorney of the bank, says:
“The stock * * * was sold to Harry D. Smith, Jr., and John M. Caffery, by the bank, for the satisfaction of the Shippers’ Oil Company for their note, and it was understood that Mr. Don Caffery, Jr., was to indorse said note, which he subsequently did. I, as representative of the bank, made a demand on the officials of the bank for the payment of this money. I cannot state that any direct demand was made [on the Shippers’ Company] for the payment of this money on the day of the sale; but it had been discussed between Mr. Hill, Mr. Williams, and myself, time and time again, and we were *653 continually asking them for money, all the time. * * * When Mr. Caffery offered me his and Mr. Smith’s note, indorsed by Don Caffery, Jr., I then told him that, the notes being payable at the Gulf National Bank, I would demand the payment of the notes, and, if they were not paid, then I was ready to sell him the col-laterals attached. I did make demand on the cashier and teller of the bank, both of whom declined payment. I therefore told Mr. Caffery that I would accept his proposition, which I did, and he executed the papers. The immediate execution of these papers was left to Mr. Williams. * * * I have seen the note, executed by the Shippers’ Oil Company to the Gulf National Bank, for $18,000, on which Mr. Hill was indorser. The note was, I think, delivered to Mr. Caffery after he had bought the collater-als. My understanding is that this note bears the indorsement on the back: ‘Transferred without recourse.’ I did not see this indorsement; but, if it is, it was evidently a mistake. • * * I do not remember having any conversation with the plaintiff and with Mr. Williams in regard to the form in which the transfer should be made. I do remember that Mr. Caffery asked me if we would transfer him the note or notes, and that I said to him that 1 thought what he was buying was the collaterals, and not the notes, but that I had no objection to transferring to him the notes, as well as the collaterals. * * * I cannot state how the transfer was made. As I have said before, I told Mr. Williams to transfer them without recourse, and I left. * * * I cannot give the exact question which plaintiff asked me, nor can I give my exact answers. All I can state is, in substance, that Mr. Caffery asked me what would be the effect of selling the note to him, and I told him he would be in exactly the same position that the bank was — that he would have the right to sell the collaterals for the collection of the note; and I suggested to him that, instead of selling him the note, it would be best for the bank to sell him the collaterals — that this would give him the ownership of the stock in the corporation, and that, after Mr. Hill’s term of office expired, he could elect his own board of directors and his own officers. I remember his asking me the question if he could not, at the present time, oust Mr. Hill as president. I told him I thought not, unless he could bring some charge against him that would render him unfit for the place. * * * As I stated before. I think Mr. Caffery’s idea, first, was to buy the note; but, after talking to me, he decided to buy the collaterals attached to the note, and that is what I sold him.”
Mr. Williams, the president of the bank, testifies in part as follows:
“The stock attached and above referred to was sold to I-Iarry D. Smith, Jr., and John M. Caf-frey, Mr. Greer acting for and in behalf of the bank, to cover the indebtedness of the Shippers’ Oil Company and the Traders' Oil Company [italics by the court], I cannot say that any direct demand was made for the payment of this money on the date of the sale; but it had been a matter of discussion between Mr. Hill, Mr. Greer, and myself for a long time, and we were continually asking- them for payment. I do not think any ultimatum was given them; but they understood that we were after the money all the time.”
On cross-examination, he says:
“The Gulf National Bank held the note of the Shippers’ Oil Company for $18,000. * * * The pledge was 29,997 shares of the capital stock of the Shippers’ Oil Company, and the in-dorsement for $8,500 appeared on the back of said Shippers’ Oil Company note. * * * Under the directions of Mr. Greer, the transfer was made by indorsement on the back of said notes: ‘Transferred to John M. Caffery; and Henry D. Smith, Jr., without recourse,’ * * * I do not know of any specific demand having been made for the payment of the note between May 3d and June 7th. * * * Mr. Greer handled the matter, and all I know is that his instructions were to indorse the notes without recourse and deliver the notes and stock. * * * There is nothing due the national bank by the Shippers’ Oil Company. * * * Tes; it is a fact that the only evidence of the transfer was on the back of the notes and the delivery-of the collaterals.”
The note of the Shippers’ Oil Company reads as follows:
“Beaumont, Texas, March 15, 1907.
“On demand, after date, we promise to pay to the order of the Gulf Nat’l Bank, at Gulf National Bank, Beaumont, Texas, eighteen thousand dollars ($18,000) for value received, with interest at the rate of eight per cent, per annum from date until paid.
“This note is secured by pledge of the securities mentioned on the reverse hereof, with the right to call for additional security, should the same decline, and, on failure to respond, this obligation shall be deemed to be due and payable, on demand, with full power and authority to sell, assign and deliver the whole of said property, or any part thereof, or any substitutes therefor, or any addition thereto, at public or private sale, at the option of said Gulf National Bank, on the nonperformance of this promise and without further notice, applying the net proceeds, first, to the payment of this note, and the balance, at the option of the Gulf National Bank, to any other liability to Said Gulf National Bank, now existing or which may hereafter accrue, and account to me for the surplus, if any, and I hereby agree to pay attorney’s fee of 10 per cent, in case of suit. It is further agreed that the pledgee shall have the right to buy in the said securities at market rate, at said private or public sale.
“[Signed] Shippers’ Oil Co.,
“By Chas. D. Hill, Prest.”
*655 On reverse:
“Shippers’ Oil Co. Cert. 11 — 9999 shares.
“ ■ “ “ “ 12 — 9999
“ “ “ “ 15 — 5000
“ “ “ “ 16 — 4999
“Contract with J. M. Caffiery & H. D. Smith, on wells 1 & 2.
“[Signed] Chas. D. Hill.
“J. M. Abbott.
“Also equity in well No. 3, Shippers’ Oil Co. Jennings.
“Paid 5/3/07, $8,500.
“$258.22 int.
“6/8/07 Transferred to John M. Caffery & H. £>. Smith, without recourse.
“[Signed] Gulf National Bank,
“A. L. Williams, Prest.”
The note of the Traders’ Oil Company, of date May 3, 1907, is drawn in the same form, but is indorsed by J. M. Abbott, and is otherwise secured by pledge of—
“Contract & a/c 10,490,00 22,000 brl oil bonded at 95 cts per brl.”
There was judgment in the district court in favor of the defendant company, and the intervener and plaintiffs have appealed.
Opinion.
The stock which is the subject of this litigation was held by the bank in pledge to secure the payment of the balance due on the note of the Shippers’ Oil Company, and it was optional with the bank either to allow matters to remain as they were, to sell the note, of which it was the owner, and, by delivering the pledged stock to the purchasers, place them in its place with respect thereto, or, on complying with certain required conditions, to sell the stock in satisfaction of the debt for which it was pledged. It is said, however, and plaintiffs’ witness, the president of the bank, so testifies, that the stock was sold “to cover the indebtedness of the Shippers’ Oil Company and the Traders’ Oil Company.” If it were true, that, fact, of itself, would be sufficient to authorize the affirmance of the judgment appealed from, since the bank could not lawfully sell the stock, save in satisfaction of the debt for which it was pledged, and the alleged purchasers were fully informed as to the situation. Upon the question whether the transaction between the bank and the plaintiff amounted to a sale of the stock, however, res ipsa loquitur. The president of the bank testifies that Greer, the vice president and attorney of the bank, handled the matter; that his instructions were “to indorse the notes without recourse” and deliver the notes and the stock; and that is what was done. But, if it had been the intention merely to sell the stock in satisfaction of the debt represented by the note for which it was pledged, there was no occasion for indorsing the note, which, being paid by the sale of the stock, would have become the property of the maker, or, in this instance, as the pledged stock belonged to the indorser, would have become the property of the latter, as the subrogee of the rights of the bank with respect thereto, and the bank could not lawfully have delivered it to any one else. Civ. Code, arts. 2053, 2161; Millaudon v. Colla, 15 La. 213; Lanata v. Bayhi, 31 La. Ann. 232; Seixas v. Gonsoulin, 40 La. Ann. 351, 4 South. 453. The sale of the stock under the circumstances would, however, not only have been unauthorized, but would have been an act of bad faith on the part of the bank, and the plaintiff must be held to have known it. It is true that the note is payable on demand at the bank, and that “presentment for payment is made at the proper place when a place of payment is specified in the instrument and it is there presented.” Acts 1904, p. 158, No. 64, § 73. It is also true that pledged stock and other movable property may be sold “in such manner as may be agreed on by the parties” (Civ. Code, art. 3165), and that in this instance there was an agreement as to the manner in which the sale should be made, or, to be more accurate, two agreements — one being the written agreement embodied in the note, and the other resulting from the course of dealing between the par *657 ties and from the assurance given by the bank, through its president, to Hill (accepting for the Shippers’ Oil Company and for himself, as indorser of the note of that company), on the morning of the day upon which the sale is said to have been made. But the question is, what did those agreements, considered together amount to? That embodied in the note (eliminating unnecessary verbiage) is as follows:
“This note is secured by pledge of the securities mentioned on the reverse hereof, with right to call for additional security, should the same decline, and, on failure to respond, this obligation shall be deemed to become due and payable, on demand, with full power and authority to sell * * * the whole of said property, or any part thereof, * * * at public or private sale, at the option of the bank, on the nonperformance of this promise, and without further notice. * * * It is further agreed that the pledgee shall have the right to buy in the said securities at market price at said private or public sale.” (Italics by the court.)
Conceding that the words “on the nonperformance of this contract” refer to the promise to pay the note “on demand,” did the parties intend, by the “demand” thus provided for, any demand which the bank might think proper (at any time, and without actual demand upon or notice to the maker of the note) to make, at the place where the note was payable, to wit, at its own banking house? And this question, we think, should be answered in the negative. By the terms of the contract the unconditional promise to pay on demand is modified to the extent that the note became due and payable “on demand” only upon the failure of the maker to respond to the call of the holder for additional security, so that the condition precedent to the exercise by the bank of the right to sell the pledged securities was that it should call for additional security, and, on the failure of the maker of the note to respond, make a demand for the payment of the note.
We find nothing in the record tending to show that a calli was made for additional security, or that the maker of the note was given any opportunity to respond to such a call, and the only demand for payment was that which the bank made upon itself, without the knowledge of the maker. It may be, and no doubt is, true that in some cases, as where the note is made payable at a fixed time, such a demand would be sufficient (where there is no stipulation requiring a previous call for additional security); but to hold it to have been sufficient in this case to entitle the bank to sell the property pledged would be equivalent to holding that within ten minutes after a demand note, payable at a bank and secured by pledge, has been discounted, and whilst the maker is counting his money, one officer of the bank can whisper a demand upon another for the payment of the note, and, on failing to obtain such payment, may sell the pledged property to the bank, without other notice to the maker- — a proposition which could not be sanctioned by any court, and which finds no support in the contract now under consideration.
Under both the civil and the common law the pledgee is regarded as the agent, bailee for hire, or trustee of the pledgor, and he could formerly sell the pledged property only by virtue of a judicial decree. The present common-law rule upon the subject, however, seems to be that the authority to sell is implied from the transaction, or determined by the stipulation of the parties. “The parties may agree,” says an eminent teacher of the common law, “in a pledge contract, on the method of sale in case of default. Such stipulations, if not unconscionable and oppressive, will govern. Thus it may be agreed that the sale shall be private, that demand and notice shall be waived, that the property may be purchased by the pledgee, but not that the pledge shall be irredeemable. * * * A stipulation in the pledge contract depriving the pledgor of the equity of redemption is void, as against public policy.” *659 Goddard’s Outlines of Bailments and Carriers, §§ 103, 106. And so, under our law, it Is provided that it “shall he lawful for the pledgor to authorize the sale or other disposition of the property pledged, in such manner as may be agreed on by the parties, without the intervention of courts of justice.” Civ. Code, art. 3165, as amended by Act No. 9, p. 36, of 1872. See, also, A. & E. Enc. of Law (2d Ed.) vol. 22, pp. 862, 882, 883, 884; Richardson v. Mann, 30 La. Ann. 1064. It is axiomatic, however, that in the absence of an express waiver of the right the pledgor is entitled after demand for and default in payment, to reasonable notice of the intention of the pledgee to sell the pledged property. Goddard’s Outlines, etc., 100. And the pledg- or is presumed to have waived nothing except what is specifically waived. Colebrooke on Collateral Securities, § 118; Waring v. Gaskill, 95 Ga. 731, 22 S. E. 659. Applying these rules to the contract here in question, we find that the pledgor waived the right to any “further notice” of the intention to sell than the “call for additional security,” followed by a demand for payment, and we are of opinion that the expression “further notice” implies that he should have been actually informed of the previous “demand,” as well as of the “call,” since one cannot be said to have received “further notice” of that of which he has received no previous notice. There is still another principle which may be here applied. From the course of dealing between the parties, and from the assurance given by the president of the bank, on the morning of the alleged sale, that nothing would be done without notice to the defendants, it is evident that the contract had never been interpreted to mean that the bank might, at any hour of the day or night, make a demand upon itself for the payment of the note, and upon'the basis of such demand proceed to sell the pledged securities without actual notice to the defendant. The question of the payment of the note had, no doubt, been discussed, and. defendant had on one occasion furnished, as additional' security, the “equity in well No. 3”; but, prior to the morning of the alleged sale, no demand for present payment, or for payment at a particular time, had ever been made, and the demand in question was made without notice to the defendant within an hour or two after it had received the assurance that nothing would be done without such notice. It is no answer to this to say that John M. Caffery, after he had completed his negotiations with the bank, telephoned to Hill that he was about to close the transaction; for, first, Hill had a right to rely upon the assurance which had been given by the bank that it would do nothing until he was notified, and, second, he was entitled to reasonable notice, and notice, even from the bank, at the moment of the alleged sale, would not have fulfilled that requirement. The notice given by Caffery is, therefore, merely corroborative of the undisputed evidence that he was fully informed as to the situation. Upon the whole, we conclude that the transaction between the bank and the plaintiff was what it purports on its face to be, to wit, a sale without recourse of defendant’s note, accompanied by a delivery of the note and of collaterals pledged to secure its payment; the effect being that plaintiffs became the owners of the note and the pledgees of the collaterals.
It is shown that Don Caffery, Jr., who indorsed the note given by plaintiffs, and who appears to have an interest with them, expressed his willingness that Hill should reestablish his position with the bank provided he would do it promptly and would release him (Caffery) from his indorsement; but John M. Caffery refused at the time to consent to such an arrangement, and his subsequent consent, if expressed, was not made known to Hill. Hill, however, made an un *661 successful appeal to the bank, and one of his counsel succeeded, though not until after judgment had been rendered in favor of the Houssiere-Latreille Oil Company, in raising money enough to reimburse the whole amount expended by plaintiffs, or for which they made themselves liable, and, a tender thereof having been made to the plaintiffs, they have obtained judgment therefor; the fact being that it was part of Hill’s agreement with Abbott that, in the event of the rendition of a judgment such as that above mentioned (in favor of the Houssiere-Latreille Company in the suit of the Jennings-Heywood Oil Syndicate), the Traders’ Oil Company would be made whole with respect to the debt represented by its note for $10,000, It was also shown that Hill made certain propositions to plaintiffs, with a view to a settlement of their differences out of court; but they were not accepted, and the fact that they were made has no bearing upon the questions here presented for decision.
Judgment affirmed.