(90 South. 769)

No. 23079.

### ALCOLEA v. SMITH.

(Nov. 29, 1921. On application for Rehearing, Jan. 2, 1922.)

*(Syllabus by the Court.)*

1. Pledges ⬥53—Stipulation that pledgee may appropriate property for nonpayment is condemned by both civil and common law, and will not be read into statute.

A stipulation in a contract of pledge that, in the event of the nonpayment of the debt at maturity, the pledgee may appropriate the pledged property to himself, has been condemned by the civil law for 1,400 years, and by the common law for a great part of that time, as contra bonos mores and unconscionable, and it will not be read into article 3165 of the Civil Code of this state, as amended and re-enacted by Act No. 9 of 1872, by reason of a doubtful implication.

On Application for Rehearing.

*(Additional Syllabus by Editorial Staff.)*

2. Interest ⬥66—Pledgor may not recover interest on amount pledgee is condemned to pay where not claimed or asked for in the petition.

In pledgor's action against pledgee for refusal to receive amount due and return the property, *held*, that interest could not be allowed on the amount of money the pledgee was condemned to pay in default of returning the jewelry as ordered, where the petition did not claim or allege that such interest was due and should be paid, in view of Code Prac. arts. 157 and 553.

3. Pledges ⬥33—Pledgee, on failing to deliver held bound to pay difference between value and amount loaned on property.

Where pledgee was condemned to pay the value of certain jewelry pledged, which he failed to deliver, *held*, that the judgment would be modified condemning him to pay the differ-

ence between such value and the amount of the unpaid loan.

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by Rafael Alcolea against Hugh F. Smith. From a judgment rejecting plaintiff's demand for certain jewelry on his paying the amount for which it was pledged or on default of its surrender for $3,500 shown to be considerably less than its value, the plaintiff appeals. Judgment annulled, and judgment entered in favor of plaintiff and against defendant condemning defendant to surrender and deliver to plaintiff the jewelry described in the petition within three days after the judgment shall become final upon plaintiff's tendering and paying the sum of $1,200, and that in default of his delivering the jewelry as thus ordered defendant be condemned to pay plaintiff the sum of $3,500, which was modified on rehearing to the payment of $2,300 in such case.

St. Clair Adams, of New Orleans, for appellant.

Robert H. Marr, of New Orleans, for appellee.

### Statement of the Case.

MONROE, C. J. This is an appeal from a judgment rejecting plaintiff's demand for certain jewelry on his paying $1,200, for which amount it was pledged to defendant, or, in default of its surrender, for $3,500, shown to be considerably less than its value; the circumstances out of which the suit has arisen being as follows:

On September 25, 1915, by authentic act executed in New Orleans, plaintiff acknowledged that defendant had loaned him $1,200, and defendant acknowledged that he "had in his possession three diamond rings; one diamond stick pin; three sets of diamond earrings; one diamond valliere;" and it was agreed that those articles were to be returned to plaintiff, upon the payment within 360 days of the amount loaned, free of further interest or other charges (a discount of $200 having been deducted from the $1,-200 in the making of the loan). It was further agreed that, if plaintiff should fail to redeem the property so pledged, within the delay specified, defendant should become the owner of it, and that in the meanwhile defendant should not be responsible for its loss by fire. It appears from the evidence that when, in September, 1916, the loan was approaching maturity, plaintiff called at defendant's office in New Orleans with a view of making a settlement, and, finding that defendant was absent, caused a telegram to be sent him by some one in the office, and on September 16, plaintiff himself wired defendant as follows:

"The contract regarding the diamonds that I have with you expires on September 19. Have called at your office several times this week to settle this matter with you, as per agreement of September 25, 1915. Your office advised me that you are in Colorado and, at my request, telegraphed you, on Thursday and Friday of this week, regarding the matter. Other friends of mine are ready to pay you the $1,200.00 and take over the diamonds on the 19th, therefore, inasmuch as you are not here to close the transaction, this is to notify you that, in no way, are the diamonds to revert to you, as per the contract mentioned, due to the fact that I am now ready and willing to pay over the money coming to you. Please advise me, by wire, as to when you will return, and it will also be necessary for you to write me, guaranteeing that the contract will be extended until the date of your return to this city. Return address 738 Audubon Building—Rafael Alcolea Grunewald Hotel Sept. 17, 1916, W. U. Tel. Co."

On September 18, 1916, defendant wired some one in his office as follows:

"Telegram just received to-day. Am not stopping Albany. Advise Alcolea will either extend or give to him upon my arrival, whichever suits him best. Stop. Diamonds Whitney vaults, and I have key, so cannot do anything until my return."

Defendant returned to New Orleans about noon on October 3, and telephoned to an of-

fice which plaintiff frequented, requesting that plaintiff call on him on that afternoon or the next morning; and plaintiff called the next morning (which was Wednesday, October 4, 1916) at 9 o'clock, when, according to his understanding of the conversation, defendant gave him four days in which to pay the $1,200 and redeem the diamonds; and plaintiff admits that he did so, but confuses the admission by saying that he fixed the expiration of the four days as being the following Saturday at 6 o'clock p. m., which he does not appear to have done on Wednesday, but attempted by means of a letter written to plaintiff some time during the day on Saturday. He was asked, on his direct examination what conversation took place between plaintiff and himself on Wednesday, the 4th, and his testimony runs as follows:

"A. He wanted me to keep the diamonds and increase the indebtedness by further charge; in other words, he was not in a position to take the property up, and simply wanted me to hold them and charge him further discount or interest, as the case may be. Q. What did you tell him about that? A. I told him it was not my business, that I had taken up the matter with him, in the first place, more as an accommodation, which he knew, and that I wanted my money. I preferred to have the money at that time to the diamonds, and asked him to arrange to take them up. And I gave him four days to take the diamonds up, which made it October 7th—6 o'clock on Saturday. Q. Did you express to him the time at which the four days would expire? A. I told him he had, apparently, sent some four days prior to the expiration of our written contract, when I was away, and, in view of that fact, I would give him the same period of time to take the diamonds up then as though I had been there when he called. Q. Did you state to him the time at which the four days would expire? A. Yes, sir; 6 o'clock Saturday night. Q. Did you express that to him or was that an inference? A. *I told him I would wait four days*, and I waited until 6 o'clock. And, further than that, in order to call his attention more particularly to it, I wrote him a letter on the morning of Saturday telling him, or referring to our conversation, and telling him that was the last day that I would wait, and that I would

wait until he called— Q. When you said that you would wait until 6 o'clock on Saturday, what did you hear of him? A. As I didn't hear from him until about 5 o'clock Monday, following, which was the 9th." (Italics by the writer.)

The witness says that the letter was written on Saturday morning, but whether in time to reach the plaintiff before 12 o'clock, noon, when the banks close on that day, is not shown.

The letter to which he refers reads as follows:

"Dear Sir: I wish herewith to confirm our conversation with you Wednesday morning, wherein I advised you that I would give you until Saturday, this date, to take up your property held by me in accordance with our agreement of September, 1915. My reason for allowing you these additional four days is, as explained to you, because of the fact that, when you called to see me regarding said property, I was out of the city, and the four days above referred to is the exact time between the time you first called and the expiration of the date of the agreement. I trust that you may get the matter fully settled to-day, as I would prefer that you come and redeem your property, in accordance with the terms of an agreement."

Plaintiff, it appears, is a native of Vera Cruz, Mexico, where he had been engaged in the practice of law from 1896 until 1914, when he left there, with his wife, mother, sister, and two other persons in his family, to make a trip to Toronto; and they were on their way home when, on reaching New Orleans, he learned of the existence of political conditions in Mexico which made it inadvisable that he should at that time return.

According to his testimony, some of the diamonds involved in this suit have long been in his family and are valued on that account in addition to their value in the market. In the course of the trial in the district court they were produced by defendant, and, by agreement, the two litigants went together to the leading jewelry stores in this city

and submitted them to the experts whom they found there, with the result that one of the experts testified that they were worth and would cost him $3,974.77, and the other valued them at from $3,500 to $5,000. Both of them testified that until called to the stand they had never been asked and had never expressed themselves upon that subject. Plaintiff, being asked in regard to his visit to defendant and what was said to him, testifies in part as follows:

"Q. When he returned to the city, did you see him? A. No; I received—on the 4th of October I received word from him, he sent me word, * * * and I received word to see him downstairs in his office. * * * Q. What did he tell you then? A. Well, he told me that —I found him in some way angry, and he told me he would give or allow four days to pay my debt. You know I cannot remember all the details of our meeting, but I remember the substance. Q. He gave you four days in which to pay your debt? A. Yes, sir. Q. When were those four days up? A. Then I had more difficulty to talk and understand English—that was two years ago—and Mr. Smith does not speak very distinct; he speaks in a way that I cannot understand very easily. Q. When were those four days that Mr. Smith gave within which to pay, after his return from Denver—when did those four days expire? A. I didn't pay any more attention to the delay; you know— (Interruption by defendant's counsel.) Q. On what day of the month of October did you see Mr. Smith? A. Well, I don't remember exactly what the 4th of October was; it must have been Wednesday. Q. But the day of the month? A. The same day that he sent word to me—on the 4th, I think. Q. How long after the time when Mr. Smith gave you four days within which to pay the money did you tender him the money? A. 1 couldn't say how many days after; I cannot say that; but it was one Monday at 3 o'clock; it was the Monday next to that 4th of October. * * * Q. Well, can you say what the value of all the jewelry was that you pledged to Mr. Smith. What price would you demand if you would make the outright sale of the jewelry? A. It is very difficult to say, because I never tried to sell them, you know, but certainly I think about $3,000, at least. Q. Their actual value or their value considering the sentimental standpoint? A. No; I don't consider the sentimental value on that $3,000."

## Opinion.

[1] Since the edict of Constantine annulling and prohibiting what was known as the lex commissoria and the stipulation in the contract of pledge which it authorized, whereby, in default of payment by the pledgor, the thing pledged became the property of the pledgee without further action on his part, such stipulations have been prohibited in all countries where the civil law prevails, and the prohibition has long since become part of the common law, the commentators on both systems agreeing that they are contra bonos mores and oppressive; that they involve the abuse of the power of the strong over the weak, represent odious speculations by those who have money, at the expense of those who need it, and are unconscionable. Denis on Contracts of Pledge, c. XXIV, p. 253 et seq., citing Troplong, Nantissement, § 379 et seq.; Pothier, Nantissement, § 18; De St. Joseph, Concordance des Codes Civiles, p. 109; Merlin, Rept. verbo "Gage"; C. N. 2578; Story on Bailments, § 345; Kent's Com. vol. 2, § 583; Jones on Pledges, § 553; Rev. Civ. Code La. art. 3132; Russell v. Southard, 12 How. 139, 13 L. Ed. 927; Peugh v. Davis, 96 U. S. 337, 24 L. Ed. 775; Pritchard v. Elton, 38 Conn. 434.

Article 3132 of the Civil Code of 1825 was an adoption in totidem verbis of article 2578 of the Code Napoléon, and reads as follows:

"Art. 3132. The creditor cannot, in case of failure of payment, dispose of the pledge, but may apply to the judge to order that the thing shall remain to him in payment for as much as it shall be estimated by two appraisers, or shall be sold at public auction, at the choice of the debtor.

"Any clause which should authorize the creditor to appropriate the pledge to himself, or dispose thereof without the aforesaid formalities, shall be null."

In the revision and re-enactment of our Code in 1870 the article quoted was given the number 3165 and reads:

"Art. 3165 (3132). The creditor cannot, in

case of failure of payment, dispose of the pledge, but when there have been pledges of stocks, bonds or other property, for the payment of any debt or obligation, it shall be necessary before such stocks, bonds, or other property so pledged shall be sold for the payment of the debt for which such pledge was made, that the holder of such pledge be compelled to obtain a judgment in the ordinary course of the law, and the same formalities in all respects shall be observed in the sale of property so pledged as in ordinary cases; but in all pledges of movable property, * * * it shall be lawful for the pledgor to authorize the sale or other disposition of the property pledged, in such manner as may be agreed upon by the parties, without the intervention of Courts of Justice; provided, that all existing pledges shall remain in force and be subject to the provisions of this act.

"Any clause which should authorize the creditor to appropriate the pledge to himself, or dispose thereof without the aforesaid formalities, shall be null."

The article thus quoted was amended and re-enacted by Act 9 of 1872, and the last paragraph (beginning, "Any clause which should authorize, etc.) was omitted, but the act contains no repealing clause.

Commenting upon that statute, Prof. Denis (Denis on Contracts of Pledge, pp. 255, 256) has this to say:

"301. Under the provisions of this law, it is the common practice now in Louisiana to stipulate in all acts of pledge that the pledgee shall have the right, in case of nonpayment, to sell the pledge at public or private sale, with or without notice, to buy it in, and so forth. But could the pledgee by virtue of the law which makes it lawful for the pledgor to authorize the sale or other disposition of the thing pledged, stipulate that it shall become his property without sale and without appraisement, though its value may be greater than the amount of the debt, as is ordinarily the case? This question has yet to be answered. It is likely that it will be answered in the negative. The prohibition contained in the article of the Civil Code of Louisiana is one of public order, as we have seen. The act of 1872 cannot be presumed to have been leveled at it, in providing that it shall be lawful for the pledgor to authorize the sale or other disposition of the property pledged in such manner as may be agreed on by the parties, without the intervention of courts of justice. Such an indirect

and implied re-establishment of the lex commissoria would be against all the rules of legislation.

"302. The common law has adopted from the civil law the wise and humane principles of the edict of Constantine. * * * In this respect the two systems seem to be on a par. Judge Story says: 'If a clause is inserted in the original contract providing that, if the terms of the contract are not strictly fulfilled at the time and in the mode prescribed, the pledge shall be irredeemable, it will be of no avail. For the common law deems such a stipulation unconscionable and void, upon the ground of public policy, as tending to the oppression of debtors.'"

During the (almost) 50 years which have elapsed since the passage of the act of 1872, and the (almost) 25 years since the publication of Prof. Denis' work, the precise question here at issue has been neither presented to, nor decided by, this court. Cases have been argued, submitted, and decided in which, the litigants having so agreed, the rights of pledgees to sell pledged property otherwise than under judgments obtained against the pledgors have been recognized, and the provisions of the act of 1872 upon that subject and to that extent have more than once, been applied. Louisiana, etc., Co. v. Bussey, 27 La. Ann. 472; Carr v. La. Nat. Bank, 29 La. Ann. 259; Lafitte, Dufilho & Co. v. Godchaux, 35 La. Ann. 1161; Smith v. Shippers' Oil Co., 120 La. 640, 45 South. 533. But until now it seems never to have occurred to any one engaged in the business of lending money on pledges or to their legal advisers that the lawmakers of this state intended by the adoption of the statute in question to revive a law and practice which by imperial authority were abrogated some 1,400 years ago, and of which nothing better has since been said than that they were obnoxious to good morals, odious, oppressive, and unconscionable. That during a half century no one has interpreted the act of 1872 as we are now invited to interpret it is to be accounted for, as it appears to us, by the fact that it is not properly susceptible of

that interpretation. According to the terms of that statute, the pledgee is first forbidden to dispose of the pledge, save by the authority of a judgment and the observance of the formalities required in judicial sales. The pledgor is then granted permission to authorize the sale or other disposition of the pledge in such manner as he and the pledgee may agree on. We then find that the concluding paragraph of the amended article (C. C. art. 3165) is omitted, which paragraph reads (as we have seen):

"Any clause which should authorize the creditor to appropriate the pledge to himself, or dispose thereof without the aforesaid formalities, shall be null."

The omission from the amending and reenacting statute of the paragraph thus quoted therefore leaves in full force the provision of the amended article authorizing the "sale or other disposition" of the pledge in such manner as may be agreed on"; but neither the amended article nor the amending statute authorize a contract of pledge whereby the pledgee is given the right to appropriate to himself the pledge upon the nonpayment of the debt at maturity. The word "sale" conveys no such idea nor do the words "or other disposition" which follow it, since a sale is an alienation, a parting with, and "or other disposition" following the word "sale" means an alienation, or parting with, ejusdem generis as sale; and either the sale of a thing or other disposition of it is the antithesis of the keeping of the thing and the appropriating of it to one's self.

If it be said that the omission from the amended article of the declaration that "any clause which should authorize the creditor to appropriate the pledge to himself * * * shall be null" carries with it the implication that it was the intention to remove the bar against the insertion of such a clause in the contract of pledge, the answer is that the declaration was unnecessary in the first instance, since the subject-matter of the clause thus referred to has been condemned by the civil law for 1,400 years as contra bonos mores and unconscionable, and it would require something more than a doubtful implication to justify any court in any civilized country in now reading it into a statute. To the contrary, the courts will read into every contract of pledge, whether it be there expressed or not, the stipulation that the pledgor shall have the right to redeem the pledged property, and that the pledgee shall not appropriate it to himself. See Jones on Pledges, § 553, and authorities heretofore cited.

It is no doubt true that, after the debt for which the pledge is given has fallen due, the parties may lawfully agree that the pledgee may keep the pledge in satisfaction of the debt, but there was no such agreement in this case.

The plaintiff (pledgor) herein was ready to pay the debt at maturity, but the defendant (pledgee) had left the state and was not ready to deliver the pledged property and receive the payment. He returned to New Orleans when it suited his convenience, and, having notified defendant to call on him, informed him, when he called, that he would give him four days within which to make the payment, following that information a day or two later with a written notice sent to plaintiff on a half holiday that the delay so accorded would expire at 6 o'clock that day (Saturday). Plaintiff appeared on the following Monday and tendered payment, which defendant refused. Having failed to provide for the surrender of the pledged property and the receipt of the payment upon the day fixed by the contract, we are at a loss to understand where he obtained the authority so peremptorily to fix the exact day and hour outside of the contract when plaintiff should settle with him and he with plaintiff. It occurs to us that, as the matter then stood, plaintiff was entitled to a hearing on that subject. It is quite certain, in any event, that plaintiff never did agree, after the ma-

turity of debt, that defendant should appropriate the pledged property to its payment. Whether the last tender made by him was within the four days allowed by defendant is, therefore, immaterial.

For the reasons thus assigned:

It is ordered that the judgment appealed from be annulled, and that there now be judgment in favor of the plaintiff, Rafael Alcolea, and against the defendant, Hugh F. Smith, condemning said defendant to surrender and deliver to plaintiff the jewelry described in the petition, within three days after this judgment shall have become final upon plaintiff's tendering and paying to him the sum of $1,200. It is further ordered that, in default of his delivering said jewelry as thus ordered, defendant be condemned to pay plaintiff the sum of $3,500. It is further ordered that defendant pay all costs.

## On Application for Rehearing.

PER CURIAM. [2] Plaintiff has filed an application for a rehearing, claiming interest on the $3,500 which defendant was condemned to pay him in default of defendant's returning the jewelry as ordered by the decree of this court. Plaintiff did not pray for interest on the $3,500 claimed in his petition, or allege that interest was due or should be paid. Interest cannot be allowed by a decree of the court unless it has been claimed in the petition. Code of Practice, arts. 157 and 553; Babin v. Nolan, 6 La. Ann. 295; Citizens' Bank v. Condran, 22 La. Ann. 53; Town of Vinton v. Lyons, 131 La. 673, 60 South. 54. In Sentell, Executor, v. Hewitt, 49 La. Ann. 1021, 22 South. 242, where interest was allowed under the prayer for general relief, in a demand in reconvention, though not claimed in the prayer, it was claimed in the body of the demand in reconvention. In Schwartz v. Cronan, 30 La. Ann. 993, where interest was allowed under the prayer for general relief, though not

prayed for, the report of the decision does not disclose whether interest was claimed in the body of the petition. In so far as these decisions conflict with the provisions of the Code of Practice, they must be considered overruled by the subsequent decisions in Town of Vinton v. Lyons, supra. Plaintiff's application for a rehearing is therefore denied.

[3] Defendant prays for a rehearing, or, in the alternative, for a correction of the decree, so as to allow him to retain the $1,200 loaned to plaintiff as a credit on the $3,500, which he has been condemned to pay to plaintiff in event of his failure to return the jewels as ordered by the decree of this court. Inasmuch as the $3,500 so ordered to be paid is the estimate of the value of the jewels, as alleged in plaintiff's petition, he is entitled to only the balance of $2,300 in default of defendant's returning the jewels as ordered by the decree of this court.

The decree heretofore rendered by this court is therefore amended so as to order that, in default of defendant's delivering the jewelry as ordered in said decree, he shall pay to plaintiff the sum of $2,300. In all other respects the decree is reinstated and made the final judgment of this court. With this amendment, defendant's application for a rehearing is denied.