FIRST NAT. BANK OF OMAHA, NEB., et al. v. ILLINOIS TRUST & SAVINGS BANK.

(Circuit Court, N. D. Illinois. December 24, 1897.)

PLEDGE—CONSTRUCTION OF CONTRACT—RIGHTS OF BANK IN COLLATERAL SECURITY.

> A note executed to a bank by a borrower contained a printed recital·that the maker had deposited collateral security for the payment thereof, "and also of all other present or future demands of any kind of the said bank" against the maker, due or not due. It further provided that the bank should have power to sell the collateral, and apply the proceeds to the payment of the note, and should "return the overplus, if· any," to the maker. The maker deposited as collateral certain shares of stock in a corporation, and subsequently increased the amount from time to time in compliance with demands of the bank on the ground that the market value of the stock had declined, leaving the margin below its requirements. *Held*, that the agreement was one of pledge, and to secure payment of the note only, as the power to sell was limited to that purpose, and that, on tender of payment of the note, the bank was not entitled to retain the stock as security for a loan previously made from the bank by the maker for a term of years on real-estate security, and which had been assumed by a subsequent purchaser of the property.

Bill by the First National Bank of Omaha and Herbert E. Gates against the Illinois Trust & Savings Bank. Heard on demurrer to bill.

Esterbrook & Davis, for complainants.
J. C. Hutchins, for defendant.

SHOWALTER, Circuit Judge. On June 28, 1894, John ·A. McShane, of Omaha, Neb., borrowed from the defendant, a banking corporation doing business at Chicago, $30,000. A printed blank, used by defendant in such cases, was thereupon filled out by one of its officers, and McShane· subscribed the same with his name. The document, barring the date and signature, reads as follows:

"On demand after date, for value received, I·promise to pay the Illinois Trust and Savings Bank, or order, thirty thousand· dollars in gold coin, or U. S. notes, or treasury notes, which are a legal tender, at its office in Chicago, with interest at the rate of four per cent. per annum, having deposited with it as collateral security for the payment thereof, and also of all other present or future demands of any kind of the said bank against the undersigned, due or not due, 300 shares Omaha Union Stock-Yards Co. stock, the market value of which is now $——. Said bank has the right to call for any additional

security satisfactory to it, and, if the same is not furnished on demand, may, at its option, declare this note immediately due and payable, without notice to me; and I hereby give the said Illinois Trust and Savings Bank, or its assigns, full power and authority, on the maturity of this note, or at any time thereafter or before, at discretion, to collect or otherwise convert said securities, or either or any part of them, or any substitute therefor, or any additions thereto, and to sell said collateral securities, or any portion thereof, at public or private sale, at the discretion of said bank, without advertising the same, or otherwise giving notice to me (and the said bank may become the purchaser at any public sale), and said bank shall apply the proceeds, after the payment of all expenses and attorney's fees attending said collection, conversion, or sale of the said collateral securities, to the payment of this note, with all interest due thereon, and return the overplus, if any, to me; and, in case the proceeds of said collection, conversion or sale of said collateral securities shall not cover the principle, interest, and expenses, I promise to pay the deficiency forthwith. And I hereby agree that said bank shall have the right, at its option, to change the rate of interest to be paid upon this note, or upon any unpaid portion thereof, upon notice in writing, which changed rate I hereby agree to pay unless the amount of principal and interest then due is paid forthwith. A notice mailed to my address shall be deemed a sufficient notice of the change of rate."

The par value of the shares mentioned was $100 per share. The market value on June 28, 1894, was $120 per share. It is the practice with Chicago banks to insist that the value of the collateral deposited with a given note shall exceed the sum borrowed by some 20 or 25 per cent., and if, owing to fluctuations in the market, the value of the collateral declines, the banker will usually demand additional collateral. On January 8, 1895, defendant bank mailed to McShane the following letter:

"Chicago, January 8, 1895.

"J. A. McShane, Esq., Omaha, Neb.—Dear Sir: Please add to your margin on demand loan, and oblige,     W. H. Reid, 3rd V. P.
"30,000.     27,000.
"300 Omaha Sk. Yds.
"3,000 short."

On January 16, 1895, defendant bank sent to McShane a second letter, as follows:

"Chicago, Jan. 16, 1895.

"Mr. John A. McShane, Omaha, Neb.—Dear Sir: Referring to our letter of the 8th inst., would say that we are still without reply to same. Our last quotation on Omaha Stock Yards was 95. At this price you are short about $11,000. Please forward additional collateral at once, and oblige,
"Very truly yours,     Jas. S. Gibbs, Cash."

On January 21, 1895, defendant bank sent to McShane a third letter, as follows:

"Chicago, Jan'y 21, 1895.

"J. A. McShane, Esq., Omaha, Neb.—Dear Sir: Please add to collateral on your demand loan, Stock Yds. quoted to-day 111. Your attention will oblige,
"Very respectfully,     W. H. Reid, 3rd V. P."

On January 28, 1895, McShane replied as follows:

"Omaha, Jan'y 28th, 1895.

"Mr. W. H. Reid, 3rd V. Pt. Ill. T. & S. Bank Chicago, Chicago, Ill. Dear Sir: I am in receipt of your favor of the 21st inst., in regard to additional collateral, and, replying thereto, I will say that I expect to be in Chicago within a day or two, and will arrange the matter satisfactory.
"Yours, very truly,     [Signed] John A. McShane."

Pursuant to the demand in the foregoing letters, McShane, on the 5th of February, 1895, delivered to the defendant bank 30 additional shares of the Omaha Union Stock-Yards Company, making a total of 330 shares. On July 31, 1895, McShane borrowed $25,000 more from the bank, and put up as collateral security 250 shares of the Omaha Union Stock-Yards Company stock, and signed a second document, tendered by the bank, the same being the printed form previously used filled out with the amount of the new loan and the specification of the collateral. The total of the two notes thus became $55,000, there being 330 shares as collateral for the first and 250 shares as collateral for the second. On January 8, 1896, defendant bank sent to McShane the following letter:

"Chicago, Jan. 8, 1896.

"John A. McShane, Esq., Omaha, Neb.—Dear Sir: Please add to the collateral on your loans with us, and oblige,

"Yours, truly, Jas. S. Gibbs, Cash.

"580 Sh. Omaha S. Y'ds.

"Loans, $55,000."

On January 16, 1896, McShane responded with the following letter, inclosing therein certificates for 50 additional shares of said stock:

"Omaha, Neb. Jan'y 16/96.

"Ill. T. & S. Bank, Chicago, Ill.—Dear Sir: In compliance with your letter of the 8th inst., I inclose you herewith 50 shares of Union Stock-Yards stock as additional collateral with my loan, making 630 shares held by you. Trusting this will be satisfactory, I am

"Yours, very truly, [Signed] John A. McShane."

Shortly before January 20, 1896, the bank demanded a still further security, and on the day last mentioned McShane delivered to the bank 50 more shares. On May 12, 1896, defendant sent to McShane another letter, as follows:

"Chicago, May 12, 1896.

"J. A. McShane, Esq., Omaha, Neb.—Dear Sir: 85 is highest for Stock-Yards stock. Please give us additional margin, and oblige,

"680 × 85=58,800 W. H. Reid, 3rd V. P.

20%  11,360

―――――――

$47,440

"Need $10,000 more. Loan, 55,000."

Responding to this, McShane delivered to the bank certificates for 100 more shares of the said stock-yards stock. The bank now held the two demand notes, together with 780 shares of the stock as collateral thereto. Three hundred and thirty shares had been deposited as collateral to the first note, 250 shares as collateral to the second note, and 200 shares had been sent in response to the demands heretofore referred to, which concerned both notes. On the 16th of October, 1896, McShane, being liable to the complainant the First National Bank of Omaha on demands aggregating some $75,000, and desiring further advances, by an instrument in writing sold, assigned, and transferred to complainant Herbert E. Gates, as trustee, all of the shares of stock already mentioned herein, subject to the lien of this defendant. He had represented to the complainant bank and to Mr. Gates that the defendant held said shares of stock as collateral

security for a debt of $55,000, and no more, and Gates was authorized, in the writing last mentioned, upon payment of the $55,000 demand, to receive and hold the shares. It appears from other averments in the bill that the purpose of the transfer to Gates was to enable the complainant the First National Bank of Omaha to pay the $55,000 debt to the defendant bank, and then use the stock as security for the prior indebtedness of McShane and an additional advance of $4,598.25 made by it to McShane. On the 10th day of February, 1897, complainants tendered to the defendant bank the sum of $55,-000, together with the interest upon the two demand notes heretofore mentioned, and demanded that the 780 shares of stock be turned over to them, at the same time exhibiting the instrument of assignment by McShane to Mr. Gates as trustee. It further appears from the bill that on May 1, 1892, McShane had borrowed from the defendant bank the sum of $100,000, for which at that time he gave his promissory note, payable in five years from that date, together with a trust deed conveying certain real estate to secure the payment of said note. In May, 1892, McShane sold the property described in the trust deed, and the purchaser from him assumed and agreed to pay the said note as part of the consideration for the property. At the time of the tender last mentioned this note was outstanding, due, and unpaid. By reason of the words, "and also of all other present or future demands of any kind of the said bank against the undersigned, due or not due," in each of the demand notes hereinbefore mentioned, the defendant bank insisted that the 780 shares were held by it as security, not only for the principal and interest of said two demand notes, but for the prior note for $100,000. Defendant thereupon refused to accept the tender above mentioned, and to deliver the stock. The tender by the complainants has been kept, and is still good, the defendant having waived the payment of the same into court by stipulation. It further appears from the bill that all of the shares except the 300 originally deposited upon the first demand note and the 250 originally deposited on the second demand note were borrowed by McShane from one John A. Creighton at the times when the several deposits were made as already detailed. The borrowing of the first 30 shares was upon the representation of Mr. McShane to Mr. Creighton that the same was to go as additional collateral security upon the one note for $30,000. The subsequent advances by Mr. Creighton were made upon the representation by Mr. McShane that the stock so advanced was to go as additional security for the two demand notes, aggregating $55,000; and prior to the last advance of the 100 shares by Creighton to McShane the latter exhibited to the former the letter of May 12, 1896, hereinbefore quoted. Said additional certificates of stock had been issued to said Creighton, and he had indorsed the same in blank. Creighton had no knowledge of the terms of the two demand notes, or of the claim on the part of the defendant bank whereby it proposed to hold the said shares of stock as security for the $100,000 note, until about the 6th of February, 1897. He thereupon, and on the 10th day of February, 1897, and at the time of the tender and demand hereinbefore mentioned, notified the defendant bank in writing that he had loaned to McShane the 230

shares of stock for the purpose of being hypothecated to secure the $55,000 and interest, and for no other purpose, and that he had subsequently assigned these shares to Gates, trustee; the sense of the bill being that Creighton, for the benefit of McShane, and to secure to the complainant bank McShane's indebtedness (for a large portion of which Creighton himself was surety), had turned over the shares to Gates. The bill prays, among other things, for an order of court directing the defendant to deliver to complainants the pledged stock upon payment of the $55,000 and interest.

A simple lien—that is to say, a right to detain chattel property until a given debt be paid, but without any right to sell and apply the proceeds in payment—is one thing; a pledge, since it implies the right in the depositary to sell the deposit, and apply the proceeds to the debt it was given to secure, is another. Shares of stock put up as collateral security constitute a pledge. The two demand notes in the case at bar are the same in form. For convenience, I refer to that of June 28, 1894. This instrument does not create a mere lien, as distinguished from a pledge. The stock deposited was to be "collateral security." The language of the instrument not only does not express the intent that the stock, or any part of it, was to be simply detained without power to sell, but it affirmatively declares the right to sell. McShane is made to say: "I hereby give the Illinois Trust and Savings Bank * * * full power and authority * * * to sell said collateral securities * * * at public * * * sale." Then follow the words: "And said bank shall apply the proceeds, after payment of all expenses, * * * to the payment of this note, with all interest due thereon, and return the overplus, if any, to me." The terms of the instrument cover any and every sale of any and every share of stock deposited which the status of that property as a pledge would have authorized. It is then declared that the proceeds of any sale must be applied on the one specific demand, and the overplus, if any, returned to McShane. That the property deposited may be sold by the pledgee to pay the debt which such property was intended to secure is part of the definition of a pledge. Without such right of sale, there can be no pledge; nor can a given chattel have the status of a pledge as to any debt for the payment of which the pledgee is not authorized to sell; nor, as between parties not under disability, could there be a decree ordering sale of property as a pledge in any case where the pledgee did not himself have the right to sell. A court of chancery does not create rights. It can only decree and enforce a right already vested in the complainant. An agreement between parties that a specific chattel held by one should not be sold to pay a designated debt otherwise than by decree of court, is conceivable. What such an agreement would amount to, and how it should be classified, need not be discussed. The sense that, as concerns the note of 1892 for $100,000, the defendant bank had the right to detain the stock, but no right, in any event, to sell the whole or any part of it, is not, as I conceive, to be extracted from the agreement which the defendant bank made with McShane. The argument that, as concerns the note of 1892 for $100,000, the stock is subject at least to a right of detention, or that as to said note there

is at least a lien which may be foreclosed in a court of equity, seems to me unsound. The specification in the contract that the proceeds of a sale by the bank of the stock deposited with that contract must be applied on the $30,000 demand, and the overplus returned to McShane, is tantamount to a statement that said stock is pledged to secure that one demand, and no other. The additional 30 shares were sent in response to a call, which meant that it should become part of the pledge for the one demand and no other. The second demand note is like the first. The additional 50 shares, and the 50 shares following, and the 100 shares still later were sent in response to calls, which meant that they should be collateral to the aggregate debt of $55,000, and to no other demand. I do not concur in the view that McShane had bound himself to send the 230 additional shares. He simply chose to do it in response to the letters written from the bank, and he must be held to have done it on the understanding and for the purpose expressed in those letters.

It is urged that the words, "and also of all other present or future demands of any kind of the said bank against the undersigned, due or not due," in each of the contracts, must have a meaning, and that, as applied to the facts, the meaning is that the overplus, in the event of sale, should be returned to McShane only in case the note of 1892 be paid, otherwise to be applied on said note. The context does not warrant this construction. The words in question were merely part of the printed formula used by the bank as applicable to many varying transactions. In the light of the subsequent writings passing between the defendant bank and McShane, it is obvious that he and the bank officer, in failing to erase the words mentioned, did not think of the note of 1892 as being a demand within the meaning of said words. They evidently thought of these words as including any and all such demands as might arise in the course of commercial banking. At that time there was not, nor might there ever be, any such demand against McShane, other than the specific note for $30,000. On this view, the words quoted were innocuous; it could make no sort of difference whether they were erased or left standing.

It is urged that the words, "and return the overplus, if any, to me," are answered if the defendant bank, after selling the 780 shares, and paying the $55,000 with part of the proceeds, shall apply the remainder to the note of 1892 for $100,000. I think not. McShane did not part with his liberty to dispose of the overplus as he saw fit. The defendant bank contracted to return the overplus. This means that, in case of sale, the overplus ceased to be within the dominion of the bank for any purpose of its own; that such overplus must go back to McShane, or to his assignee.

The counsel for the defendant suggests the theory of a banker's lien as applicable to the case. Assuming that there could be such a lien for a demand like that of 1892, how could such lien be asserted in the face of an express contract by the bank to the contrary? It occurs to me that possibly the present controversy might have been determined in an action of replevin, but counsel have agreed to test the rights of the parties by this bill. I assume, therefore, that the case has a footing on the equity side of the court. The demurrer to the bill is overruled.