V. H. RUSSELL and M. V. MOFFETT, a Copartnership doing business under the name of RUSSELL AND MOFFETT, v. EMPIRE STORAGE & ICE COMPANY, a Corporation, Appellant.—59 S. W. (2d) 1061.

Division One, April 20, 1933.

708

*H. G. Leedy* and *M. W. Rider* for appellant.

*Maurice H. Winger, Alton Gumbiner, Archibald J. Weaver* and *Winger, Reeder, Barker, Gumbiner & Hazard* for respondent.

HYDE, C.—This is an action for damages for breach of warehouse contracts for storage of eggs. Plaintiffs' petition was in two counts. Each stated "that the contract of bailment consisted of written or printed warehouse receipts which are not in possession or under the control of plaintiffs. . . . The said warehouse receipts, however, provided that plaintiffs had the right to keep said eggs in said cold storage up to and including December 31, 1925, at the said designated price for storage, unless plaintiffs sooner desired to remove said eggs, or any of them."

Plaintiffs' first count alleged delivery to defendant for storage in their cold storage warehouse 1200 cases of eggs in first-class, marketable condition, and further alleged:

"That prior to December 31, 1925, they withdrew four hundred (400) cases (being lot designated by defendant as 'D-304') of said 1200 cases of eggs from defendant's said cold storage warehouse and paid the charges on the same, and that said 400 cases of eggs were on the date of said withdrawal redelivered to these plaintiffs by defendant damaged and spoiled in that they were foul, tainted and were contaminated by the odor and unnatural taste and flavor of fruit and vegetables and other unnatural and obnoxious flavors; and not only were said eggs damaged, but the cartons, fillers and cases in which they were packed gave off a very obnoxious and meaty odor and other obnoxious odors."

Plaintiffs claimed damages of $2,074.50 because of this alleged condition of these 400 cases of eggs. Plaintiffs further alleged in their first count that the rest of the eggs (690 cases) were, on December 31, 1925, also "in a damaged, spoiled and unmarketable condition in that they were foul, tainted and were contaminated by the odor and unnatural taste and flavor of fruit and vegetables and other unnatural and obnoxious flavors; and not only were said eggs damaged, but the cartons, fillers and cases in which they were packed gave off a fruity, vegetable and meaty odor and other obnoxious odors; all of which aforesaid facts made said eggs worthless for sale on the open market." Plaintiffs alleged that because of this condition defendant "has become liable to pay plaintiffs the value of the same, to-wit, the sum of $8,080." Plaintiffs prayed judgment on the first count for the total of these two items, $10,154.50, interest and costs.

Plaintiffs' second count asked judgment for $11,550, claimed to be the value of 1100 other cases of eggs (stored in defendant's ware-

house prior to the storage of the eggs involved in their first count), on the theory that plaintiffs were entitled to the possession of these 1100 cases of eggs upon payment of loans secured by these eggs and the storage charges upon them. Plaintiffs' second count alleged "that on December 31, 1925, they did tender and offer to pay to defendants the total sum of all loans, interest, warehouse charges, advances and insurance allocated to and applicable to said 1100 cases of eggs as aforesaid, to-wit: the sum of $8,607.04, . . . (and still offer and tender and are ready and willing to pay all of said sums), and then and there demanded said 1100 cases of eggs." Plaintiffs' second count further alleged that defendant refused their tender and would not deliver the 1100 cases of eggs "unless these plaintiffs would also then and there pay to defendants (in addition to the said sum of $8,607.04) all warehouse charges, advances, loans, interest and insurance applicable and allocated to the said 800 cases of foul and contaminated eggs referred to in Count I hereof."

Defendant's answer admitted the storage of the eggs and alleged, as to Count I, that "defendant loaned to plaintiffs on each of said lots and warehouse receipts on the security and pledge thereof, the sum of Twenty-eight Hundred ($2800) Dollars, and defendant further states that neither the said Twenty-eight Hundred Dollars loaned nor the charges for storage and insurance agreed to be paid by plaintiffs to defendants (except as to one of said three lots) has been paid, and that until a payment of such loans and charges has been made, plaintiffs are not entitled to possession or accounting for the said eggs so stored."

Defendant's answer also alleged as to Count II:

"Defendant on the security of said three lots and consignments of eggs, and upon the security of the three warehouse receipts evidencing such three contracts of storage, advanced and loaned to plaintiffs the sum of Twenty-eight Hundred Dollars ($2800) on each of such consignments and receipts, and by the contract of loan it was agreed between the parties that defendant might hold said eggs and said receipts and all of them, until all debts of the plaintiffs to the defendant should have been paid in full, and that the plaintiffs have never paid their debts to defendant, and therefore have never become entitled to the possession of said eggs or any contract therefor, but on the contrary, failed and refused to make such payment thereof, often demanded."

Defendant's answer asked no affirmative judgment. Plaintiffs' reply alleged that "subsequent to the alleged contract of loan therein referred to the said defendant agreed with these plaintiffs that plaintiffs had the right to withdraw and remove from storage any or all of the eggs stored with defendant by plaintiffs at any time upon the payment to defendant of the allocable part of storage, advance-

ments and charges applicable to the said lot, or any part of a lot withdrawn by plaintiffs.''

The eggs described in Count II were delivered to defendant in three lots, for each of which separate negotiable warehouse receipts were issued, as follows: Receipt No. 419, for 400 cases received April 20, 1925, placed in its Warehouse F and called Lot F-313; receipt No. 477, for 400 cases received by defendant April 23, 1925, placed in its Warehouse A and called Lot A-301; and receipt No. 494, for 300 cases received May 20, 1925, placed in its Warehouse A and called Lot A-209. These were referred to as ''early eggs.'' Defendant inspected these eggs for the purpose of making loans upon them to plaintiffs and graded them as ''extras,'' which was the classification of eggs of the highest quality. There was no contention that these eggs were damaged.

Plaintiffs throughout June and July stored with defendant the eggs described in Count I, and referred to as ''late eggs.'' Their evidence was:

''We bought them, as indicated, from the various people who had them to offer, off the trucks that came in from the surrounding towns, graded them, candled them, packed them and put them on our own truck and Mr. Russell hauled them down to the Empire Storage and Ice Company as they would accumulate, thirty, forty and fifty cases in a lot. . . . In storage eggs we took out only the top of the eggs and stored, and what is known as 'trade eggs,' the dirty eggs, the checks, the soiled or discolored eggs, we sold to the trade on the Street. However, we did sell, of course, some eggs, straight current receipts that we did not candle, grade or do anything to. . . . When we found it possible to sell eggs, we probably took our profits and sold them, and when we bought them at a price that they did not sell at a profit, we graded them, the top ends of them, and sold the other end. . . . We might be one day accumulating enough eggs to truck over to the warehouse; we might be two or three days, but at no time was there any particular length of time of accumulating any eggs.''

Plaintiffs also obtained some eggs from other dealers on the ''egg street,'' the designation of the district where their place of business was located, in Kansas City, at times to fill out lots for storage. These ''late eggs'' were all stored in defendant's Warehouse D. These were designated Lot D-243, Lot D-304 and Lot D-332. There were 400 cases (30 dozen eggs per case) in each of these lots; 400 cases being a carload of eggs. These eggs were inspected by defendant, by withdrawing ten cases from each lot and examining half of each case. The first two lots were designated as ''firsts,'' which was the next classification of eggs below ''extras.'' Lot D-332 was classified as ''candle receipts,'' which was a much lower classification. Negotiable

warehouse receipts were issued to plaintiffs for each of these lots. After each lot was placed in storage defendant made separate loans to plaintiffs on each lot on the basis of $7 per case. A separate note for the loan on each lot was made and the negotiable warehouse receipt for that lot was held as collateral thereto, as follows:

Lot F-313—(early eggs—$2800 note dated April 21, 1925, collateral, negotiable warehouse receipt No. 419.

Lot A-301—(early eggs)—$2800 note dated April 21, 1925, collateral, negotiable warehouse receipt No. 477.

Lot A-209—(early eggs)—$2100 note dated May 23, 1925, collateral, negotiable warehouse receipt No. 494.

Lot D-243—(late eggs)—$2800 note dated June 12, 1925, collateral, negotiable warehouse receipt No. 549.

Lot D-304—(late eggs)—$2800 note dated June 22, 1925, collateral, negotiable warehouse receipt No. 567.

Lot D-332—(late eggs)—$2800 note dated July 20, 1925, collateral, negotiable warehouse receipt No. 599.

Each warehouse receipt provided that the season rate for storage to January 1, 1926, was fifty cents per case and that monthly rates were fourteen cents per case for the first month and seven cents per month thereafter. All of the notes were payable on demand to the order of defendant and bore interest from date at six per cent. The lot of eggs, upon which each loan was made, was described in the negotiable warehouse receipt held with it as security. Each of the notes also contained the following provisions:

"The payment of this note and any renewal thereof and any other obligation of the undersigned to the payee herein, now existing or that may hereafter arise, is secured by the hypothecation of certain personal property delivered to the payee. If for any reason the holder of this note shall deem himself insecure, the undersigned agrees to deposit with the holder, when demanded, additional security to the satisfaction of said holder; otherwise this note shall mature at once. Any assignment or transfer of this note, or other obligations herein provided for, shall carry with it all collateral securities deposited and all rights under this agreement. . . . The holder hereon, on default of payment of this note or any part thereof, according to the terms hereof, is hereby authorized to sell said collateral or any part thereof at public or private sale and with or without notice, and apply the proceeds to the credit of this note and the costs of said sale; the balance, if any, to be paid to the undersigned."

Prior to December 31, 1925, plaintiffs withdrew 110 cases from Lot D-332, as follows:

November 6, 30 cases upon payment of $7.60 each or $210;
November 28, 15 cases upon payment of $8.80 each or $132;
December 26, 35 cases upon payment of $7.60 each or $266;

December 28, 5 cases upon payment of $7.60 each or $ 38;

December 30, 25 cases upon payment of $7.60 each or $190.

In regard to the disposition of these cases plaintiffs' testimony was:

"Well, in accordance with the usual custom of moving eggs out and jobbing them on the Street, we withdrew them in lots 15 and 20 cases, and we would sell this fellow on the Street and the other one, who were our regular customers, one or two cases of these eggs, with the expectation of getting repeat orders, placing our eggs regularly with him. We had a line of customers that from time to time bought one, two and three and five cases of eggs of us, that we had been selling fresh eggs too and as they went on to storage we would start in to introduce our storage holdings to them, to work them out in the regular way, and we withdrew in that way 110 cases of Room 'D,' but we never got any repeat orders from the various customers we sold them to."

Plaintiffs claimed that they had complaints from these purchasers and had to take back some of the eggs.

About the first of December defendant asked plaintiff to reduce its loans and suggested that it would be advisable to sell out the "late eggs." Plaintiffs did not sell them and defendant finally asked for a reduction of $2 per case on all eggs remaining in storage as of January 1, 1926. On December 23, defendant wrote plaintiffs a letter referring to this verbal requirement and asking also the payment of storage charges of fifty cents per case and interest to that date. After receipt of this letter plaintiffs claim to have gone to defendant's treasurer and told him that they would take up the loans and pay the charges on all of the eggs except those stored in Warehouse D. Plaintiffs' evidence was that there had been some rumors about the eggs in Warehouse D not keeping well, and that, about December 25, they went there to inspect their eggs. The testimony as to the inspection they made and the condition they found was as follows:

"Well, the room smelled bad to start with. There was mold spores all over the egg cases; a great many of them, they were wet and the floors were wet. . . . The odor was bad. It smelled like disinfectant, like the room had been disinfected; the water was on the floor, the mold spores was on the egg cases; the floor was wet, water was dripping from the coils, the baffle boards apparently were leaking. . . . We opened the various cases, some of the different lots and proceeded to put them before the candling machine to see about the shrinkage and how they had kept and I inspected the fillers and the flats and broke some of the eggs. The eggs before the candler looked good, full bodied. . . . The fillers were wet and cumpled down, and the cases themselves were wet and more or less warped . . . We numbered the eggs according to the number you have on the warehouse receipts there, and took them home to cook and to

eat. We cooked them and we served them for dinner. We did not eat the eggs. We cooked them and found them very strong, objectionable and musty tasting. We tasted them, but we did not consider them fit to eat. They were too strong. They were not rotten; the eggs stood up good, with a good body and looked good. It was not the ordinary storage taste of a storage egg; it was the taste of a musty, pungent, acrid taste. They did not taste like good eggs. They were not palatable by any means."

In addition to their own evidence, plaintiffs had the evidence of other egg men (who said they also had eggs damaged in Warehouse D) and experts tending to show that Warehouse D had too much moisture; that there was too much variation in temperature; that various kinds of fruits and vegetables were stored in and near it which, because of the conditions there, tended to impart a bad odor and a strong bitter taste to eggs stored in Warehouse D; that the cold storage equipment in Warehouse D was the type used for ripening bananas and was unsuitable for egg storage; and that it would not properly control the moisture in the room where plaintiffs' eggs were stored. Plaintiffs' explanation of this was as follows:

"The shell of an egg is a porous substance known as calcium carbonate and nature itself, when that egg is laid, coats that egg shell with a substance that makes it practically air tight, but this substance that coats that egg shell is readily dissolved by water and whenever you disturb the coating on that egg shell, it being porous, then it is subject to the introduction of any foul gas or smell and will readily absorb it. . . . Grapefruit or citrus fruit in storage give off a natural gas or ordor or smell. As to the effects of odorous gases from grapefruits or citrus fruit on eggs which are nearby and with which these gases come in contact—the history of storage— it has been very damaging to eggs wherever they are stored in the same building. The eggs absorb this acrid, pungent odor, and it is from the gases given off by grapefruit or lemons, or any citrus fruits. The effects of the odor emanating from potatoes on eggs would be the same from any vegetable that gives off a pungent odor. Eggs are especially susceptible—I would say very bad. The effects of the odor of celery on eggs stored nearby would certainly be bad. Air currents which carry strong odors of citrus fruit or potatoes would certainly contaminate eggs which those air currents would come in contact with. That is particularly true when the air is moist and damp."

Plaintiffs' evidence, however, did not show that their "late eggs" in Warehouse D were so damaged as to be entirely worthless. Plaintiffs' testimony concerning their value was as follows:

"Direct Examination

"Q. Did an egg like that have a market value in Kansas City on December 31, 1925? A. No, sir; no quotable market. The eggs in

that condition—they, of course, had some value, but not a quotable value, because they would not grade anything.''

''Recross-Examination

''Q. What was that market value? A. That would be a question for the individual buyer to determine what he would give for them. There was no market quotations; no quotable quotations on eggs in that condition.

''Q. What, in your judgment as an expert, were they worth? A. Well, they were moving on the Street and did move eggs of that quality at around 20 to 21 cents.''

Defendant's evidence, also given by experienced egg men, warehousemen and storage experts, on the other hand, tended to show that conditions were proper in Warehouse D for egg storage: that it was well constructed for that purpose; that the ventilating and storage machinery did control the moisture and was proper equipment for egg storage; that many other Kansas City firms had eggs stored in Warehouse D which kept in good condition; that fruits and other vegetables which they had in storage were so placed that they could not affect plaintiffs' eggs; that the deterioration found in plaintiffs' eggs was due to the fact that they were ''late eggs'' gathered and kept in cases in plaintiffs' place of business during warm weather; and that they were not of sufficient quality and condition to keep well when delivered to defendant's warehouse. It took two weeks to try this case in the circuit court (we may add, it took the writer of this opinion longer than that to dispose of it here) and in the long record presented, there was much conflicting evidence as to the keeping qualities of ''late eggs,'' the proper time of the year to dispose of them, the condition of other eggs in defendant's Warehouse D, and proper practices in storing eggs. It was also shown that there was an exceptionally large number of eggs in storage in the United States that winter. It was uncontradicted that there was a price decline between December 31, 1925, and January 2, 1926, and that prices continued to fall throughout January and February on eggs of all classifications. In fact, the basis of plaintiffs' claim for damages for refusal to give them possession of their ''early eggs,'' on December 31, is this decline in prices.

On December 28, Lot D-304 was shipped to Chicago. Plaintiffs say this was done upon defendant's demand, while defendant claimed it was voluntarily done by plaintiffs. Plaintiffs had the evidence of the Chicago broker who sold them that they were in bad condition and had to be sold at from eighteen to twenty-six cents per dozen. These eggs brought a net return to plaintiffs of $2,017.74, which, according to plaintiffs' evidence, was only about one-half the amount they would have been worth if they had been kept properly by defendant. When these eggs were shipped, plaintiffs drew a sight draft

of sufficient amount to cover plaintiffs' loan and storage charges on this lot. The net returns from the eggs was almost $1,000 less and plaintiffs paid this amount so that defendant received the full amount of all loans and storage charges which it had against Lot D-304.

Defendant had evidence to show that the slump in prices commenced early in December, 1925, while plaintiffs' evidence was that there was no break until January 2, 1926. However, on December 31, 1925, the day before the $2 per case reduction was due, likewise, the day before the end of the storage season stated in the warehouse receipts to which the rate of fifty cents per case applied, plaintiffs, with their attorney, appeared at defendant's office, stated they would insist on some adjustment for the "late eggs" in Warehouse D, which they claimed had been damaged, and offered to pay all loans and charges on the 1100 cases of "early eggs" in Warehouses A and F. Defendant refused to accept the amount tendered, $8,607.04 (it does not dispute the amount tendered nor object to the form of the tender) and release the "early eggs" unless plaintiffs would also pay the loans and charges on the remaining 690 cases of "late eggs." Thereafter, defendant, during the month of January, sold all of defendant's eggs under the authority of the provisions of the notes signed by plaintiffs.

According to plaintiffs' evidence, the market value in Kansas City December 31, 1925, of the "early eggs" was thirty-six cents per dozen, or $10.80 per case. Plaintiffs' evidence also was that the value of good "late eggs" was then thirty-four cents per dozen, or $10.20 per case. Defendant showed that it shipped Lot F-313 on January 2, and sold it for $8.70 per case, and that it shipped Lot A-301 on January 9, and received for it $8.40 per case. The remainder of the "early eggs," the 300-case lot, A-209, was shipped by defendant January 18, with other eggs which were sold in lots of from 30 to 170 cases at prices ranging from $7 to $10 per case, so that it is not possible to tell from the evidence exactly what plaintiffs' eggs in that shipment brought. As a matter of computation, however, it can be determined from this evidence that the "early eggs" brought enough to pay all loans and storage charges which defendant had against them and left some surplus. Defendant, however, did not realize enough from its sale of plaintiffs' remaining "late eggs" to pay the loans and storage charges on them. It shipped Lot D-243 on January 18, and realized $7.05 per case. It shipped the remaining 290 cases of Lot D-332 on January 23, and received only $6 per case. Whether or not the excess received from the sale of the "early eggs" was sufficient to cover the deficiency in the loans and charges on the "late eggs," the evidence does not conclusively show. As near as we can tell, defendant just about broke even. The verdict of the jury was for the plaintiffs on the first count for $9,812.91, and on

the second for $12,935.08. From the judgment entered upon this verdict defendant has appealed.

It seems that both parties proceeded throughout the trial upon an incorrect theory of their rights. Defendant evidently considered that plaintiffs had no rights concerning the eggs until they paid off the loans which they secured. While this was the English rule (Holliday v. Holgate, L. R. 3 Exch. 299) and was once apparently followed in this State (McClintock v. Central Bank, 120 Mo. 127, 24 S. W. 1052), it has been expressly repudiated by this court in Kegan v. Park Bank, 320 Mo. 623, 8 S. W. (2d) 858. Plaintiffs, on the other hand, proceeded upon the theory that, if possession of their eggs was wrongfully withheld by defendant, they were entitled to recover the full value of the eggs without reduction for the amount of defendant's loans. The trial court so instructed the jury. These instructions, upon the measure of damages, on both counts of plaintiffs' petition are erroneous. This is more readily apparent when we consider plaintiffs' Instruction 5, as to the measure of damages on plaintiffs' second count covering the "early eggs." We will, therefore, first consider it. This count was not, as was the first count, an action for damages to the eggs. These eggs were not damaged and this count was an action by a pledgor against the pledgee for damages for refusal to give possession of the pledged goods upon tender of the amount of the loan. Plaintiffs' argument here (that this case is to be determined by the rules of a warehouseman's common law liability and not the law of pledges) overlooks the essential differences between these two actions. For the purpose of considering the measure of damages which this instruction stated, we will assume that, because the "late eggs" were damaged by defendant's negligence, plaintiffs, by reason of their tender of December 31, 1925, were entitled to the possession of its 1100 cases of "early eggs" stored in Warehouses A and F. Under those circumstances, defendant's refusal to give plaintiffs possession would be a conversion of the eggs. [21 R. C. L. 675, sec. 36; 49 C. J. 951, sec. 104.]

Instruction No. 5 stated:

"The jury are instructed that if you find for plaintiffs on the second count of their amended petition, you will assess as their damages, if any, the actual market value, if any, of said eggs of plaintiffs stored in Warehouses 'A' and 'F,' mentioned in evidence, at Kansas City, Missouri, on December 31, 1925, less the storage and insurance charges due defendant on said eggs on said date," and also "Interest at 6 per cent per annum from December 31, 1925."

If the storage and insurance charges should be deducted from the value of plaintiffs' eggs in fixing the amount of plaintiffs' recovery, why not the amount of the loans? The result reached, if they now collected the judgment, would be that plaintiffs would get out of the whole transaction $20,605.08 (not considering interest on loans)

for eggs at most worth $11,880 on December 31, 1925. (Judgment $12,935.08, plus $7,700, which defendant advanced by loans.) Plaintiffs justify this only upon the ground that defendant did not set up in its answer a counterclaim affirmatively asking judgment for the amount of its loans. They overlook the fact that this case was tried upon a petition which stated that they were still tendering these amounts. Furthermore, defendant sold all the eggs which secured the loans, thus got back the money it had loaned, and, therefore, if it had the right to keep it, really had no reason to ask an affirmative judgment against plaintiffs on the notes. If these 1100 cases of eggs were worth $11,880, as plaintiffs claim, $7,700 of that value was actually received by them when they borrowed that amount on them. If these eggs had been immediately either destroyed by defendant's negligence or converted by defendant to its own use, it would only have been liable to plaintiffs for the balance of that value, $4,180. This is good law and good sense, as well as good arithmetic because that would be the amount plaintiffs were actually damaged. [Kegan v. Park Bank, 320 Mo. 623, 8 S. W. (2d) 858; Hornsby v. Knorpp, 207 Mo. App. 302, 232 S. W. 776; Bruce v. Crysler (Mo. App.), 217 S. W. 563; Tobener v. Hassinbusch, 56 Mo. App. 591; Whitman v. Boston Term. Refrigerating Co. (Mass.), 124 N. E. 43; Alcolea v. Smith (La.), 90 So. 769, 24 A. L. R. 815; Hallack Lumber & Mfg. Co. v. Gray (Colo.), 34 Pac. 1000; Austin v. Vanderbilt (Ore.), 85 Pac. 519, 6 L. R. A. (N. S.) 298; Wilkins v. Redding (Neb.), 97 N. W. 238 (as to tender); 3 Joyce on Damages, 1992, sec. 1928; 1 Sedgwick on Damages (9 Ed.) 127, sec. 80, Vol. 2, p. 969, sec. 497c; 49 C. J. 961, sec. 145; 21 R. C. L. 677, sec. 39; 26 R. C. L. 1152, sec. 68; 38 Cyc. 2103.] This would especially be true where plaintiffs plead the amount of their debt; and where the security pledged was, not merely the personal property itself, but the negotiable warehouse receipts the transferee of which, under our statutes, obtains title to the goods (see Secs. 14410-15, R. S. 1929; Sec. 14430, R. S. 1929; 27 R. C. L. 968-71, secs. 24-26); and without which the pledgor cannot transfer title to them.

■ This court reviewed the authorities on this subject in Kegan v. Park Bank, supra, and after holding that tender of the debt secured and demand for the return of the collateral was not necessary before suing for damages for conversion, where the pledgee had disposed of the collateral so that he could not return it, this court said:

"But it does not follow that the pledgor is wholly freed of his indirect or limited liability on the debt secured. The obligations of the pledgor and pledgee are reciprocal. It is the duty of the pledgee to return the collateral on payment of the principal debt, but it is equally the duty of the pledgor to satisfy the debt to obtain a return of the collateral. [Nevius v. Moore, supra, 221 Mo. l. c. 360, 361, 120 S. W. 43.] The law does not treat the conversion of

the pledged security as a destruction and annulment of the pledge contract, but regards it simply as a breach thereof. [Schaaf, Admr., v. Frees, supra, 90 Mo. App. l. c. 116.] Hence it is almost universally held that in the pledgor's suit for conversion the pledgee may recoup the amount of the principal debt. [21 R. C. L. sec. 30, p. 677; 31 Cyc. p. 847.] . . .

"By the recoupment the pledgor's damages are held to the value of his interest in the collateral; that is to say, the value of the collateral minus the amount of the principal debt, if the former exceed the latter. [26 R. C. L. sec. 68, p. 1153; Work v. Bennett, 70 Pa. 484, 488, 489.]

"But unlike our statutory counterclaim, a common-law recoupment is purely defensive, and no affirmative judgment can be rendered thereon. [24 R. C. L. sec. 3, p. 793, sec. 5, p. 795; 34 Cyc. p. 643; Emery v. St. L., K. & N. Ry. Co., 77 Mo. 339, 345.] The effect thereof is merely to abate or diminish the plaintiff's damages, not to destroy his cause of action."

It is said (57 C. J. 358, sec. 1): "Recoupment is the act of rebating or recouping a part of a claim upon which one is sued by means of a legal or equitable right resulting from a counterclaim arising out of the same transaction. It is the right of defendant, in the same action, to claim damages from plaintiff, either because he has not complied with some cross obligation of the contract upon which he sues, or because he has violated some duty which the law imposed upon him in the making or performance of that contract. . . . Recoupment rests upon the principle that it is just and equitable to settle in one action all claims growing out of the same contract or transaction." It is further said: "The object of a plea of recoupment is to rebate or recoup in whole or in part the claim sued on." [57 C. J. 372, sec. 20; see, also, 24 R. C. L. 793, secs. 3, 802, secs. 11, 847-50, secs. 51-52.]

Defendant, here, set up in its answer the amount of its loans and the pledge of the eggs as security therefor. We think this was a sufficient plea of recoupment, when all the facts concerning the pledge were stated and the amount due defendant on the loans December 31, 1925, which was admitted to be correct, was still tendered by plaintiffs in their petition. [See 49 C. J. 310, sec. 380; 24 R. C. L. 875, sec. 82; Sec. 776, R. S. 1929.] Since they did not offer this in cash, was it not an offer that defendant might keep that much out of the proceeds of the eggs? It would have been better pleading for defendant to have stated all the facts by going further and stating that it sold the pledged property and setting out the amounts it thereby received. However, its evidence showed that it did sell them and what it received, and, as stated, the amount of the debt was never in dispute.

■ Plaintiffs now suggest defendant might not have owned these notes but the part of plaintiffs' amended petition (filed January 17, 1928) quoted herein recognized an indebtedness of plaintiffs to defendant as $8,607.04, on December 31, 1925, which they stated they "still offer and tender and are ready and willing to pay." Furthermore, these notes were not only thus recognized in the pleadings as due to defendant but were in defendant's possession and were offered in evidence by it. They were demand notes and the date of the trial, at which they were produced, was three years after the date of their execution. There was no claim made then that anyone other than defendant was the owner or holder of any of them. If plaintiffs had shown that defendant had sold the notes to some third party to whom, as a holder in due course, plaintiffs were compelled to pay them, then, of course, they would be entitled to recover the full value of their eggs from defendant, if it had wrongfully refused to deliver them, sold them and kept the proceeds. It was not shown that anyone (not even defendant, who got enough money to pay them from the sale of the eggs) had ever attempted to collect them from plaintiffs. On the contrary, the inference is plain that they were collected by selling the eggs. Since defendant was bound to apply the proceeds of the eggs to the payment of the notes they secured, plaintiffs were entitled to have them cancelled and delivered to them had they asked for that to be done, but they were not entitled to have the full value of the eggs when they admitted their own indebtedness to defendant for which they were security. We, therefore, hold that if plaintiffs are entitled to recover under their second count, the damages which they are entitled to recover is the difference between the value of the 1100 cases of eggs on December 31, 1925, and the amount which they then tendered to defendant, with interest, and they are also entitled to have cancelled and returned to them the three notes (one for $2,100 and two for $2,800) which these 1100 cases of eggs secured. It is, of course, reversible error to give the jury the wrong measure of damages.

■ The same error is found in Instruction 4 concerning the measure of damages as to the 690 cases of "late eggs" described in plaintiffs' first count, which stated:

"The jury are instructed that if you find for plaintiffs on the first count of their amended petition and that the 690 cases of eggs in Warehouse 'D' mentioned in evidence, not delivered to plaintiffs, were on December 31, 1925, damaged as defined by Instruction 1, given you by the Court, you will assess as plaintiffs' damages, if any, as to said 690 cases, the actual market value, if any, on December 31, 1925, in Kansas City, Missouri, of an equal amount of undamaged eggs of the same kind and character as contained in said 690 cases, less the amount of unpaid storage charges due on said 690 cases on said date."

If these eggs were so damaged by defendant's negligence that they became by December 31, 1925, worth less than the amount of the loans and charges against them due from plaintiffs to defendant, but would have been, if kept properly, worth more on that date than the amount of such loans and charges (all the evidence showed good "late eggs" would have been worth more but was conflicting as to how much more) then plaintiffs are entitled to recover the difference between the value of 690 cases of undamaged eggs, of the same kind and grade, and the amount of the loans and charges on them and they are also entitled to have cancelled and returned to them the two $2,-800 notes secured by these two lots of eggs. However, even if there had been no loans on the "late eggs" the measure of damages (the full value of the eggs less storage charges) stated in Instruction 4 would still be incorrect. Plaintiffs' own evidence was that the "late eggs" in Warehouse D were not rotten; that they had some value; and that this value on December 31, 1925, in Kansas City, was around twenty to twenty-one cents per dozen. Defendant actually got a net return of a little more than that for them in January, after prices had admittedly gone down. The most that plaintiffs would have been entitled to recover had their loans been paid off was the difference between the market value of a like amount of undamaged eggs of the same kind and character on December 31, 1925, in Kansas City, and the actual market value of the 690 cases of eggs in their damaged condition on that date. [6 C. J. 1165, sec. 170; 3 R. C. L. 155, sec. 79; 8 R. C. L. 487, sec. 47; 27 R. C. L. 1005, sec. 66; 17 C. J. 877, sec. 183; 40 Cyc. 480.] This is the measure of damages recognized in plaintiffs' Instruction 4 (the difference between good eggs and what these brought) as to the 400 cases of "late eggs" shipped to Chicago on December 28, 1925. ■ We may here say, in passing, that since there was evidence that the eggs were shipped to Chicago upon defendant's demand, it was proper, as the instruction did, to authorize the jury, if they believed this evidence, to charge the defendant with the extra expense of transportation and sale at Chicago. However, plaintiffs' petition alleged that plaintiffs "withdrew 400 cases (being lot designated by defendant as D-304) of said 1200 cases of eggs." Upon retrial the plaintiffs, to justify this, should amend their petition to conform to the evidence they rely upon. Furthermore, the instruction should require the jury to find that the eggs were shipped to Chicago "upon the demand of defendant" and not as it did "upon the request of *and/or* demand of defendant." A mere request voluntarily acted upon would not be sufficient, and the words "*and/or*" tend only to uncertainty of meaning. ■ This freakish symbol has been condemned as unintelligible. [See Carlin v. Millers Motor Corp., 265 Ill. App. 353; Preble v. Architectural Iron Workers' Union, 260 Ill. App. 435; see, also, State v. Dudley, 159 La. 872;

Sturgeon Bay Harbor v. Leatham, 164 Ill. 239; Cuthbert v. Cumming, 10 Exch. 809.] This should not be used in instructions.

Since this case must be retried, a consideration of the real merits of the controversy is necessary. There are two questions to be decided: First—(which is for the jury) Were plaintiffs' "late eggs" damaged by defendant's negligence? Second—(which is for the court), Did defendant have the right to hold the "early eggs" as security for the loans made on the "late eggs" as well as for the loans made on them? Defendant contends that it did and that its demurrer to the evidence as to the second count should have been sustained.

It is apparent, from the evidence and from defendant's conduct, that plaintiffs' "late eggs" were, on December 31, 1925, worth less than the loans and charges against them. If this condition was caused by defendant's negligence, then, if undamaged eggs of the same quality would have been worth the amount of such loans and charges, or more, plaintiffs were entitled to recover on their first count. Defendant's own evidence indicates that good "late eggs" were worth at least twenty-eight cents per dozen on December 31. At that price they would have more than paid out and, as stated, the amount they would have been worth above the loans and charges was the proper measure of damages. For any damages more than that plaintiffs would only be entitled to credit on the loans. This they could get by having their notes cancelled.

In view of a retrial, we will also consider (before considering the second question above stated) defendant's contention that plaintiffs' Instruction 1, which hypothesized the facts the jury must find in order to entitle plaintiffs to a verdict upon their first count, was erroneous. This instruction authorized a verdict for plaintiffs on their first count if the jury found that they delivered their "late eggs" to defendant for storage until December 31, 1925, in good, sweet, wholesome, marketable condition, and if they further found:

"That on said date 690 cases of said eggs of plaintiffs still remained in storage in said Warehouse D, and that at said time they, or any of them, were foul or were contaminated by the taste or flavor of fruit or vegetable, or other unnatural taste or obnoxious flavor, (*or*) *that the cartons, fillers or cases in which said eggs were packed, if so,* gave off an obnoxious or meaty odor or other obnoxious odors, . . . *and* if you further find and believe from the evidence that by reason of said damaged condition, if any, of said eggs stored in said Warehouse D, as aforesaid, or any of them, (*or*) *by reason of the damaged condition, if any, of said cartons, fillers and cases in which said eggs, or any of them, were packed, the plaintiffs sustained damage, and if you further find that said damaged condition, if any,* of said eggs, or any part of them, (*or*) *of any cartons, fillers and cases*

*in which said eggs, or any of them, were packed,* if you so find, *was caused by the failure, of the defendant* as a public cold storage warehouse *to use such care* and caution as an ordinary, careful and prudent person, engaged in the business of operating a cold storage warehouse for hire in Kansas City, Missouri, would use under the same or similar circumstances as those mentioned in evidence.''

Plaintiffs' first count was an action for damages to their ''late eggs.'' It alleged that the eggs (in the 690 cases) were made worthless by all of the facts alleged therein, to-wit: That the eggs were foul, tainted and contaminated as there described and that ''not only were the eggs damaged but the cartons, fillers and cases in which they were packed gave off a fruity, vegetable and meaty odor.'' This instruction, to authorize a verdict, did not require a finding that the eggs were worthless, but (as the portion we have italicized shows) authorized a verdict for plaintiffs, on the first count, not only if the jury found the eggs, or any of them, were foul or contaminated and that by reason of said damaged condition of the eggs or any of them plaintiffs sustained damage because of defendant's failure to use due care; but it also authorized a verdict for plaintiffs, on the first count (regardless of whether any eggs were damaged), if the jury found ''that the cartons, fillers or cases in which the eggs were packed gave off an obnoxious or meaty odor'' and that ''by reason of the damaged condition of said cartons, fillers and cases in which said eggs, or any of them, were packed the plaintiffs sustained damages'' caused by defendant's failure to use due care. This was broader than the petition which alleged, as a basis for recovery, damage to the eggs themselves (so as to be worthless) caused in part to the bad condition of the fillers (their evidence was that making the fillers damp helped to damage the eggs). While it might be true that, even though the eggs themselves were not damaged, bad condition of the cartons, fillers and cases, in which they would have to be sold, might decrease the market value of the eggs there was no evidence as to what the amount of such decrease in value of the eggs from damages to the fillers and cases alone would be. ■

Furthermore, after the jury was thus authorized to find a verdict for plaintiffs on this count if ''said eggs or any part of them'' or even if only the ''cartons, fillers and cases in which said eggs, or any of them, were packed'' were damaged by defendant's lack of due care, Instruction No. 4 followed and directed them if they found for plaintiffs to render a verdict for them for the full value of 690 cases of undamaged eggs (less storage charges) if they found ''that the 690 cases of eggs . . . were, on December 31, 1925, damaged as defined by Instruction 1.'' These two instructions taken together seem broad enough to allow the jury to find for plaintiffs for the full value of the eggs in the 690 cases, not if the eggs had become

worthless, but if any of the eggs in these cases were damaged (one egg per case) or even if no eggs were damaged if the fillers and cases were damaged. If this is not what they mean, at least their meaning is indefinite and uncertain and they are confusing and misleading. These instructions in this form should not be given on another trial. Plaintiffs are, of course, entitled to damages without proving the value of the eggs was entirely destroyed, but they are not in any event entitled to recover more than the actual amount their property was decreased in value by reason of defendant's negligence. We have hereinabove stated the proper measure of damages as to this count. As to the care of goods in storage required of defendant, which is another criticism made of the instruction, this is fixed by Section 14394, Revised Statutes 1929, as "such care in regard to them as a reasonably careful owner of similar goods would exercise." It would be safer to follow it, on retrial, than to set up a different standard.

█ Finally, we will consider the question of whether plaintiffs had the right to possession of their "early eggs" by paying only the amount they tendered. Each of the notes clearly stated that the hypothecated property secured, in addition to the note itself, "any other obligation of the undersigned to the payee herein, now existing or that may hereafter arise." Such provisions are valid. [49 C. J. 937, sec. 79; 21 R. C. L. 654, sec. 18.] Plaintiffs do not contend otherwise, but say that this was limited by the final provision of each note concerning the power of sale which stated that after a sale the holder of the note should "apply the proceeds to the credit of this note and the costs of said sale; the balance, if any, to be paid to the undersigned." It has been so held (Omaha First National Bank v. Illinois Trust Co., 84 Fed. 34), and the opposite conclusion has also been reached (Slaughter v. Texas Life Ins. Co. (Tex.), 218 S. W. 1109; Parks v. Savanah National Bank & Trust Co. (Ga.), 130 S. E. 365).

In Omaha National Bank v. Illinois Trust Company, supra, the language was that the proceeds should be applied "to the payment of this note, with all interest due thereon, and return the overplus, if any, to me." It was held, under the terms of this note providing that the maker had deposited certain notes with a bank as security for the payment of the note "and also of all other present or future demands of any kind of the said bank against the undersigned, due or not due," that the bank was not entitled to hold the collateral deposited as security for a note made to the bank on real estate security for a term of years (several years before) the real estate having been sold and the loan assumed by a subsequent purchaser. This real estate note, therefore, was an obligation upon which the maker was only secondarily liable. The court said: "In the light of the

subsequent writings passing between the defendant bank and Mc-Shane, it is obvious that he and the bank officer . . . did not think of the note of 1892 (the real estate note) as being a demand within the meaning of said words. They evidently thought of these words as including any and all such demands as might arise in the course of commercial banking.'' It seems from the court's language that had there been another commercial banking note which was a direct primary liability of the same maker, it might have held that the bank had the right to apply the proceeds of the collateral to it. For a discussion of the right to apply the proceeds of pledged property to cover the pledgor's contingent liability as secondary obligor see 43 American Law Reports, 1069.

We have a different situation here. The loans and pledges in this case were all the direct obligations of plaintiffs alone and were essentially part of one transaction. Plaintiffs' themselves argue this, in their contention that the whole arrangement made one contract partly oral and partly in writing, and their own evidence was that a representative of defendant solicited their egg storage business and at that time offered them an advance of $7 a case upon all eggs they put in storage during the season. The ''early eggs'' were at all times the most valuable security. The notes were made as carload lots were placed in storage. The notes not only contained the provisions just referred to but also provided for the deposit of additional security when demanded. They were all demand notes and further provided that they became matured obligations upon any failure of the maker to comply with a demand for further security. Would not these provisions indicate the right to demand and hold what was already deposited with the payee? The rules governing the construction of such agreements are stated as follows:

''The intention of the parties, however, especially of the pledgor, as determined by a proper construction of the provision as to general indebtedness, is the controlling element in the operation of this rule; and accordingly a pledge containing such a provision will secure only such other debts or liabilities of the pledgor as the terms of the pledge show it was the intention of the parties it should secure; and will not be extended to a debt or obligation other than that intended by the pledgor, . . . if the language is ambiguous and the meaning doubtful, its provisions will be limited to a restricted class of obligations presumed to have been in the contemplation of the parties when the contract was made; and where the pledge is on a printed form furnished by the pledgee and signed by the pledgor, any doubt arising as to its proper interpretation will be construed in favor of the pledgor.'' [49 C. J. 938, sec. 79; see, also, Deen v. Bank of Hazelhurst (Ga.), 147 S. E. 909; Fourth National Bank v. Stahlman (Tenn.), 178 S. W. 942, L. R. A. 1916A, 568; Hellman

Commercial Trust & Savings Bank v. Armstrong (Cal.), 179 Pac. 432; Foster v. Abrahams (Cal.), 241 Pac. 274.]

Giving full effect to these rules, we think the circumstances of this case show that it was the intention of the parties that all of the warehouse receipts should be security for all of plaintiffs' notes and that application of the surplus, of the sale of one carload lot of the eggs, to the deficiency on notes of loans on other carload lots does not, in view of all of the terms of the note, violate the provision that the balance, after the sale of collateral, is "to be paid to the undersigned." It is paid to plaintiffs, here, by paying their notes. It has been held that the words "paid" and "applied" may be synonymous. [4 C. J. 1400; 46 C. J. 1168.] We hold that was the intention of the parties in this case. Moreover, under our uniform Warehouse Receipt Act a lien is provided, not only for storage or other charges, but "also for all lawful claims for money advanced" (Sec. 14400, R. S. 1929) which "may be enforced against all goods, whenever deposited, belonging to the person who is liable as debtor for the claims in regard to which the lien is asserted." [Sec. 14401, R. S. 1929.]

Plaintiffs further contend that even if the collateral provisions of the notes are so construed that they were still entitled to possession of the "early eggs" by paying only the loans and storage charges on them by reason of the subsequent contract alleged in their reply; that they could "remove from storage any or all of the eggs stored with defendant at any time upon the payment to defendant of the allocable part of the storage, advancements and charges." Plaintiffs also say that the original agreement was partly written and partly verbal. While that may be true, yet the alleged subsequent agreement was a complete change of the part which had been reduced to writing (the notes) and into which any prior verbal negotiations had been merged. Of course, the parties had a right, as plaintiffs argue, to make such a subsequent oral agreement. But before defendant would be bound by any such agreement which deprived it of its important rights under the written contracts (the notes) to hold its most valuable security for any deficiency due to lack of value of its other security, there would have to be a valid consideration for this new agreement. Plaintiffs' evidence wholly fails to show any consideration whatever for the alleged subsequent agreement. Plaintiffs suggested none except they say "sufficient consideration was present where, as here, the parties acted upon the arrangement agreed upon." The fact that plaintiffs were permitted to remove the less valuable "late eggs" upon payment of $7 per case and storage and interest is neither evidence of an agreement that they might, upon the same terms, remove the more valuable "early eggs," nor evidence that there was any consideration for

such an .agreement. Plaintiffs' Instruction No. 2 was therefore erroneous. Plaintiffs' Instruction No. 3 was also erroneous. Plaintiffs incorrectly say that when defendant gave plaintiffs a statement of the amount which would be due on the loans on the ''early eggs'' on December 31, 1925, there was an account stated. The rule of account stated does not apply to promissory notes. [1 R. C. L. 209, sec. 4.] Furthermore, no one even claimed that the statement furnished was an offer to release the ''early eggs'' upon the payment of the amount shown by it or that defendant in making it agreed to waive the right it claimed to hold them until the ''late egg'' loans were paid. Plaintiffs' own evidence is to the contrary and shows that defendant was insisting upon that right at the very time it furnished this statement.

Since defendant was entitled to hold the ''early eggs'' for the ''late egg'' loans, we hold that plaintiffs could only be entitled to recover on their second count by first showing that damage to the ''late eggs'' was caused by defendant's negligence in an amount greater than the amount of the loans and charges against them. If that were true defendant would have had no right to hold the ''early eggs'' after plaintiffs' tender of the amount shown by the statement furnished because then the amount tendered would have paid off all of plaintiffs' indebtedness; that is, damages to the ''late eggs'' greater than the amount of the loans would leave no indebtedness against them and since the amount tendered covered the total indebtedness on the ''early eggs'' there would be no remaining indebtedness for which the collateral could be held. However, plaintiffs' own evidence showed that the damage to the ''late eggs'' was not more than fourteen cents per dozen (difference between 34 and 20 cents) which would only amount to about half of the loans and charges on the ''late eggs.'' If defendant was entitled to hold its collateral (the ''early eggs'') for the loans on the ''late eggs,'' it was entitled to hold it for half of those loans or for any amount of them remaining unpaid. In other words, it had the right to hold all of its collateral until all the loans for which that collateral was held were paid in full. [Kegan v. Park Bank, 320 Mo. 623, 1. c. 651, 8 S. W. (2d) 858, 1. c. 872; 49 C. J. 942, sec. 85, p. 970, sec. 176; 21 R. C. L. 652, sec. 17.] Since that is true, and since plaintiffs did not prove damages to the ''late eggs'' of an amount equal to the loans and charges against them, it follows that they were not entitled to possession of the ''early eggs'' upon payment of the amount they tendered; and defendant's demurrer to the second count should have been sustained. Plaintiffs could have paid off all loans and still sued for the damages to their ''late eggs.'' By not doing that, they took their own chances on the price of ''early eggs'' in case they failed to prove damages to the ''late eggs'' equal to or greater than the loans and charges

734

against them. If, however, plaintiffs recover damages on the first count (because the jury finds that defendant damaged their "late eggs" and that good "late eggs" were worth more than the loans and charges on the damaged "late eggs") then plaintiffs would also be entitled to recover from defendant any excess which the "early eggs" brought above the loans and charges against them, to pay which defendant sold them in January, 1926.

Defendant, in addition to the matters we have discussed, makes a number of contentions concerning the rulings of the trial court in admitting and excluding evidence. If this case is retried under the proper applicable rules of law, which we have pointed out, we do not think the matters complained of, insofar as they may have been erroneous, will recur, and it would serve no useful purpose to prolong this already long opinion by discussing them here.

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur, except *Hays, J.,* not voting, because not a member of the court at the time cause was submitted.